# U. S. BULK CARRIERS, INC. *v.* ARGUELLES

No. 29.   Argued November 12, 1970—Decided January 13, 1971

DOUGLAS, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACK, HARLAN, and BLACKMUN, JJ., joined. BLACK, J., filed a concurring statement, *post,* p. 358. HARLAN, J., filed a concurring opinion, *post,* p. 358. WHITE, J., filed a dissenting opinion, in which BRENNAN, STEWART, and MARSHALL, JJ., joined, *post,* p. 366.

*George W. Sullivan* argued the cause and filed a brief for petitioner.

*I. Duke Avnet* argued the cause and filed a brief for respondent.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a suit for seaman's wages accruing from services rendered in foreign commerce. Federal jurisdiction was claimed under 28 U. S. C. § 1333 which grants exclusive jurisdiction to the district courts in any "admiralty or maritime" case. A collective-bargaining agreement contained provisions concerning wages payable when seamen were dismissed or when their employment was terminated; and it provided a grievance procedure and for arbitration of disputed claims. Those procedures were not pursued by the seaman. He sued in the federal court instead.

The District Court granted the employer's motion for summary judgment, ruling that the principles we announced in a series of decisions starting with *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448, and extending to *Republic Steel Corp.* v. *Maddox*, 379 U. S. 650, governed this maritime case and that the federal court had no jurisdiction to adjudicate the maritime claim but only to enforce the grievance procedure or an arbitration award that might be given. The Court of Appeals reversed by a divided vote, 408 F. 2d 1065, and we granted certiorari, 398 U. S. 957.

The Labor Management Relations Act, 1947, 61 Stat. 136, provides a federal remedy to enforce grievance and arbitration provisions of collective-bargaining agreements in an industry "affecting commerce," § 3( ) (a), 29 U. S. C. § 185 (a); and it is clear that "com erce" includes foreign commerce. 29 U. S. C. § 152 ). It is also clear that this employee's basic wage an ! the overtime rate of pay were fixed or determinable by the collective-bargaining agreement. And it is generally true, as stated in *Vaca* v. *Sipes*, 386 U. S. 171, 184, that when the employee's claim "is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced."

The question here is not the continuing validity of *Lincoln Mills* and its progeny. The question is a distinctly different one, and that is whether the earlier, express, and alternative method of collecting seamen's wages contained in 46 U. S. C. § 596 has been displaced by § 301 of the Labor Management Relations Act or whether so far as seamen and their wages are concerned § 301 is only an optional method of resolving the controversy.

Title 46 U. S. C. § 596, which derives from the Act of July 20, 1790, § 6, 1 Stat. 133, provides in relevant part:

"The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, *which sum shall be recoverable as wages in any claim made before the court . . . ."* (Italics added.)

Moreover, 46 U. S. C. § 597, which also derives from the 1790 Act, provides:

"Every seaman on a vessel of the United States shall be entitled to receive on demand from the master of the vessel to which he belongs one-half part of the balance of his wages earned and remaining unpaid at the time when such demand is made at every port where such vessel, after the voyage has been commenced, shall load or deliver cargo before the voyage is ended, and all stipulations in the contract to the contrary shall be void:

> *Provided,* Such a demand shall not be made before the expiration of, nor oftener than once in five days nor more than once in the same harbor on the same entry. . . ."

The statutory remedy speaks in terms of the amount of wages due and owing and the penalties for non-payment, and it specifies the timetable within which the payments must be made. Section 596 speaks of a penalty for nonpayment recoverable "as wages in any claim made before the court." This implies a right to make the claim to the court and not a duty to make it before a grievance committee or before an arbiter. Hence § 596 does not wholly jibe with § 301. We often must legislate interstitially [1] to iron out inconsistencies within a statute or to fill gaps resulting from legislative oversight or to resolve ambiguities resulting from a legislative compromise. It is earnestly urged that the grievance procedure established in the collective-bargaining agreement can give effect to these payments and penalty provisions and that the agreement is therefore not in

---

[1] "I recognize without hesitation that judges do and must legislate, but they can do so only interstitially; they are confined from molar to molecular motions." *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205, 221 (Holmes, J., dissenting).

Mr. Justice Cardozo, in speaking of the construction of laws to achieve justice and harmony, said:

"All departments of the law have been touched and elevated by this spirit. In some, however, the method of sociology works in harmony with the method of philosophy or of evolution or of tradition. Those, therefore, are the fields where logic and coherence and consistency must still be sought as ends. In others, it seems to displace the methods that compete with it. Those are the fields where the virtues of consistency must yield within those interstitial limits where judicial power moves." Selected Writings 136 (Hall ed. 1947).

derogation of the ancient statutory remedy which Congress has provided.

Seamen from the start were wards of admiralty. See *Robertson* v. *Baldwin*, 165 U. S. 275, 287. In 1872 it was provided that the federal courts might appoint shipping commissioners "to superintend the shipping and discharge of seamen" in our merchant fleet. Cong. Globe, 42d Cong., 2d Sess., 1836.[2] Commissioners indeed served, 46 U. S. C. § 541 (1940 ed.), as an administrative adjunct of the federal courts until July 16, 1946, when § 104 of Reorganization Plan No. 3 of 1946 abolished them. 60 Stat. 1098. No other administrative agency was substituted. The federal courts remained as the guardians of seamen, the agencies chosen by Congress, to enforce their rights—a guardian concept which, so far as wage claims are concerned, is not much different from what it was in the 18th century.

We reviewed the legislative history of § 301 in *Textile Workers* v. *Lincoln Mills*, 353 U. S., at 451–456. The matter of foremost concern in Congress was the enforceability of collective-bargaining agreements. The essence of § 301 was a new federal policy governed by federal law—"that federal courts should enforce these agreements on behalf of or against labor organizations and that industrial peace can be best obtained only in that way." *Id.*, at 455. Enforcement by or against labor unions was the main burden of § 301, though standing by individual employees to secure declarations of their legal rights under the collective agreement was recognized. *Id.*, at 456. Since the emphasis was on suits by unions and against unions, little attention was given to the assertion

---

[2] And see Cong. Globe, 42d Cong., 2d Sess., 1838, 1863, 2172, 2206, 3437, 3572, 3911.

of claims by individual employees and none whatsoever concerning the impact of § 301 on the special protective procedures governing the collection of wages of maritime workers. We can find no suggestion in the legislative history of the Labor Management Relations Act of 1947 that grievance procedures and arbitration were to take the place of the old shipping commissioners or to assume part or all of the roles served by the federal courts protective of the rights of seamen since 1790.

It is earnestly urged that the literalness of the old statute should give way to the progressive philosophy of the new procedures.

It is said that arbitration would be most appropriate because "a familiarity with the customs and practices of shipping would be distinctly helpful in assessing the validity of the claims," and the "underlying wage claims [are] based on factual disputes." Resolving factual disputes is hardly uncommon in federal district courts. And while an arbitrator in the area may have expertise, for 180 years federal courts have been protecting the rights of seamen and are not without knowledge in the area.

It is also said that the informal, readily available grievance and arbitration procedures might defeat any overreaching and delay by the employer which § 596 was designed to reach. We do not hold that § 596 is the exclusive remedy of the seaman. He may, if he chooses, use the processes of grievance and arbitration. Yet, unlike Congress, we are not in a position to say that his interests usually will be best served through § 301 rather than through § 596.

The literal conflict between this ancient seaman's statute and the relatively new grievance procedure is one which we think Congress rather than this Court should resolve. We do not sit as a legislative committee of revision. We know that this employee has a justiciable

claim. We know it is the kind of claim that is grist for the judicial mill. We know that in § 596 Congress allowed it to be recoverable when made to a court. We know that this District Court has the case properly before it under the head of maritime jurisdiction. We hesitate to route this claimant through the relatively new administrative remedy of the collective agreement and shut the courthouse door on him when Congress, since 1790, has said that it is open to members of his class.

What we decide today has nothing whatsoever to do with grievance claims of the maritime unions against employers or the claims of employers against them, for neither is touched by § 596. We deal only with the seaman's personal wage claims.

Maritime unions, of course, like other unions, gain "prestige" by processing grievance claims. *Republic Steel Corp.* v. *Maddox, supra,* at 653. And employer interests are served "by limiting the choice of remedies available to aggrieved employees." *Ibid.* In *Maddox,* there was no express exception governing individual claims of employees from § 301 grievance procedures and we declined to carve one out under the circumstances there present. The circumstances here are quite different because of the express judicial remedy created by § 596. The reluctance in *Maddox* to redesign the statutory regime of § 301 makes us equally reluctant to redesign the statutory regime of § 596.

The chronology of the two statutes—§ 596 and § 301—makes clear that the judicial remedy was made explicit in § 596 and was not clearly taken away by § 301. What Congress has plainly granted we hesitate to deny. Since the history of § 301 is silent on the abrogation of existing statutory remedies of seamen in the maritime field, we construe it to provide only an optional remedy to them. We would require much more to hold that

§ 301 reflects a philosophy of legal compulsion that overrides the explicit judicial remedy provided by 46 U. S. C. § 596.

*Affirmed.*

MR. JUSTICE BLACK concurs in the judgment and opinion of the Court while still adhering to his dissent in *Republic Steel Corp.* v. *Maddox,* 379 U. S. 650.

MR. JUSTICE HARLAN, concurring.

I join in the opinion and judgment of the Court, but deem it advisable to add some thoughts of my own.

## I

I do not think that the mere provision by federal statute of a judicial forum for enforcement of the wage claims of a subclass of workers forecloses application of the arbitration principles of *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448 (1957), and *Republic Steel Corp.* v. *Maddox,* 379 U. S. 650 (1965); nor do I understand the Court's opinion today to so hold. In *Smith* v. *Evening News Assn.,* 371 U. S. 195 (1962), we held that a suit in the state courts by an individual employee charging employer discrimination in violation of the collective-bargaining agreement was not foreclosed by the availability of an unfair labor practice proceeding before the National Labor Relations Board based on the same conduct. There we explicitly noted the absence of a grievance arbitration provision in the contract which had to be exhausted before recourse could be had to the courts. *Id.,* at 196 n. 1. Later, in *Republic Steel Corp.* v. *Maddox, supra,* at 652, we cited this portion of *Smith* as support for the broadly stated proposition that "[a]s a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must

attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress." (Emphasis omitted.) *Maddox* held that an employee was compelled to exhaust contractual grievance machinery as a prelude to commencing a § 301 suit on the contract in the state court. Finally, in *Carey* v. *Westinghouse Corp.*, 375 U. S. 261 (1964), we held that a union could compel an employer to arbitrate a contractual grievance arising out of events which also might support proceedings before the NLRB for either an unfair labor practice under § 8 (a)(5) of the National Labor Relations Act, as amended, or a petition clarifying the union's representation certificate under § 9 (c)(1). See also *Old Dutch Farms* v. *Local 584, I. B. T.,* 243 F. Supp. 246 (EDNY 1965); *United States Steel Corp.* v. *Seafarers*, 237 F. Supp. 529 (ED Pa. 1965). See generally *Vaca* v. *Sipes,* 386 U. S. 171, 183–184 (1967).

*Smith, Carey,* and *Maddox* together evince the fundamental role arbitration plays in implementing national labor relations policy. They also evince the crucial role of the federal judiciary in forging the proper relationships among available arbitral, administrative, and judicial forums for vindicating contractual and statutory rights of employers, unions, and employees. In light of these cases, I cannot infer, from the mere provision by Congress of a federal judicial forum for enforcement of the wage claims of a subclass of workers' wages, that this Court is foreclosed from requiring arbitration under the collective-bargaining contract.

But in forging this relationship among potentially competing forums for the effectuation of contractual and statutory rights of individuals and organizations, we have always proceeded with close attention to the policies underpinning both the duty to arbitrate and the provision by Congress of rights and remedies in alternative forums. This Court has always recognized that the

choice of forums inevitably affects the scope of the sub-
stantive right to be vindicated before the chosen forum.
In particular, where arbitration is concerned, the Court
has been acutely sensitive to these differences. Thus,
in *Wilko v. Swan,* 346 U. S. 427 (1953), the Court faced
a conflict between congressional policy favoring arbitra-
tion, as manifested in § 3 of the United States Arbitration
Act, 9 U. S. C. § 3, and congressional policy favoring
protection of securities purchasers from fraud, as mani-
fested in § 12 (2) of the Securities Act of 1933, 48 Stat.
84, 15 U. S. C. § 77*l* (2). The Court carefully analyzed
the impact which remission to arbitration would have on
the scope of the substantive federal right involved in that
case and concluded that conflicting congressional goals
would best be served by construing the nonwaiver provi-
sions of the Securities Act[1] as applying to the choice of a
judicial forum as well as the substance of the Act's pro-
tection. See *Wilko v. Swan, supra,* at 434–439. Central
to the process of reconciliation in that case was the recog-
nition that the effectiveness of any pro-arbitration policy
is dependent, in the first instance, on a limited scope of
judicial review of the arbitrator's determination.

And in *Bernhardt v. Polygraphic Co.,* 350 U. S. 198
(1956), in holding that state law controlled on the ques-
tion of reference to arbitration in a diversity suit brought
in a federal court, the Court offered the following con-
siderations on the impact which reference to arbitration
has on the scope of the substantive right:

> "The nature of the tribunal where suits are tried
> is an important part of the parcel of rights behind

---

[1] Section 14 of the Securities Act of 1933, 15 U. S. C. § 77n,
provides:

"Any condition, stipulation, or provision binding any person acquir-
ing any security to waive compliance with any provision of this
subchapter or of the rules and regulations of the Commission shall
be void."

a cause of action. The change from a court of law to an arbitration panel may make a radical difference in ultimate result. . . . Arbitrators do not have the benefit of judicial instruction on the law; they need not give their reasons for their results; the record of their proceedings is not as complete as it is in a court trial; and judicial review of an award is more limited than judicial review of a trial—all as discussed in *Wilko* v. *Swan* . . . ." 350 U. S., at 203.

Normally, the impact on the substantive right resulting from the decision to remit the individual to the arbitral forum is acceptable because the parties themselves have consented to that forum. Compare *Atkinson* v. *Sinclair Refining Co.,* 370 U. S. 238 (1962), with *Drake Bakeries* v. *Local 50, American Bakery Workers,* 370 U. S. 254 (1962). And, with respect to the individual employee seeking to bypass the arbitral forum in a suit brought "simply on the contract," see *Maddox, supra,* at 657, the fact that his substantive rights derive solely from the contract, and that he owes those rights to the actions of his union representative in the collective-bargaining process, warrants the extension of the boundaries of collective consent to his individual remedial preferences. A suit simply on the contract to enforce contractual grievances is the normal labor arbitration situation, and "it cannot be said, in the normal situation, that contract grievance procedures are inadequate to protect the interests of an aggrieved employee until the employee has attempted to implement the procedures and found them so." *Maddox, supra,* at 653. In *Maddox,* we laid out in full the strong policy concerns which support exclusivity in the arbitral forum, *supra,* at 653–656, and then expressly noted the absence of countervailing positive reasons where the suit was simply on the contract. *Supra,* at 657. It is this state of

affairs that supports the presumption of comprehensive-
ness underpinning this Court's § 301 labor arbitration
doctrines. *Maddox, supra,* at 657.

## II

Arguelles' suit, unlike Maddox's suit, is not "simply
on the contract"; he invokes the court's jurisdiction
seeking, in addition to the overtime wages allegedly due
him under the collective-bargaining agreement, a statu-
tory claim for refusal or neglect to pay his wages accord-
ing to the timetable prescribed in 46 U. S. C. § 596
"without sufficient cause." In this circumstance, the
presumption of comprehensiveness of the arbitral remedy
is, in my view, rebutted.

But, of course, the policies underpinning *Maddox* are
still relevant to the process of forging relationships
among potentially competing forums in this case. Here,
as in *Maddox,* the union's status as exclusive bargaining
representative will most certainly be bolstered by requir-
ing the employee to vindicate both his contractual and
statutory rights in the arbitral forum. *Supra,* at 653.
And, even more importantly, here as in *Maddox,* the
availability of an alternative forum for vindicating both
statutory and contractual rights allegedly abridged in
the same transaction cuts significantly into the desirabil-
ity of the arbitral forum from the employer's negotiating
viewpoint. *Maddox, supra,* at 656–657. But, in the
present context, it is crucial to recognize that these policy
considerations underpinning arbitration argue, not merely
for reference to the arbitrator as a matter of prior ex-
haustion of internal organizational remedies, but also for
extremely limited judicial review of the arbitrator's deci-
sion. Indeed, this Court's decisions in the *Steelworkers
Trilogy* make very clear that the scope of judicial review
of the arbitrator's judgment where matters of contract

rights are concerned is limited to a threshold determination of the arbitrability of the dispute. *United Steelworkers* v. *American Mfg. Co.*, 363 U. S. 564 (1960); *United Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574 (1960); *United Steelworkers* v. *Enterprise Wheel & Car Corp.*, 363 U. S. 593 (1960). The extreme limitation of judicial review, and the expansive reading of consent, are both important to the task of effectuating national labor policy; both are legitimized, in my view, by the derivation of the individual's substantive legal right from the collective-bargaining agreement.

Where, however, the § 301 dispute implicates federal statutory rights, it is incumbent upon this Court to fashion the relationships among forums according to an analysis of the policies underpinning both § 301 and the federal statute the employee invokes, rather than simply transposing *ipso facto* the Court's labor arbitration jurisprudence. Thus, in the analogous situation where the disputed transaction implicates both contractual rights and rights enforceable in NLRB proceedings, we do not simply assume that because the dispute involves a contract grievance, and the contract contains a typically broad arbitration provision, remission to arbitration on the presumption of consent—combined with virtually no judicial review—follows automatically. Rather, the Court takes account of the views of the NLRB, as the agency charged with enforcement of the substantive statutory right in question, on the difficult issue whether the interests of national labor policy, as manifested both in § 301 and the unfair labor practice provision, will best be served by remission to arbitration. See, *e. g., Carey* v. *Westinghouse Corp.*, 375 U. S., at 271–272; *Smith* v. *Evening News Assn.*, 371 U. S., at 197–198.

## III

Here Seaman Arguelles seeks to vindicate a federal statutory right to prompt payment of wages due him. His original complaint stated a cause of action under 46 U. S. C. § 596, which provides as follows:

> "The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court . . . ."

These provisions of Title 46 derive from § 6 of the Act of July 20, 1790; see 1 Stat. 133. Also derived from § 6 of the original Act is 46 U. S. C. § 597, providing for part payment of wages earned during interim stops in port for the discharge of cargo.[2] Sections 596 and 597 go

---

[2] Arguelles attempted to amend his complaint prior to the summary judgment hearing to state a complaint under 46 U. S. C. § 597 as well as § 596. The court refused the proffered amendment pending its ruling on the summary judgment motion. Brief for Respondent 7 n. 4.

beyond the mere provision of a federal judicial forum for vindication of a worker's wage claims; they represent a congressional policy to secure to the individual seaman the prompt payment of his wages [3] as part of a broader protective and remedial scheme intended for the benefit of seamen. See *Isbrandtsen Co.* v. *Johnson,* 343 U. S. 779, 784–786 (1952). This legislation, though antedating the emergence of modern collective-bargaining institutions, must be taken to represent a continuing congressional policy to protect seamen as individual laborers.

In the instant case, remission to arbitration under the usual assumption concerning the scope of judicial review would mean that a denial of the grievance without any explanation on the arbitrator's part would have to stand. Given the assumption concerning scope of judicial review, the seaman's statutory right to double wages in the event of failure, "without sufficient cause" to pay promptly within the meaning of § 596 is, as a practical matter, subject to the unreviewable discretion of the arbitrator.

But the usual assumption concerning judicial review need not necessarily obtain in situations of this sort, any more than the usual assumptions concerning the boundaries of the individual's consent to the actions of his bargaining representative in agreeing to the broad arbitration provision need necessarily obtain. Two possibilities suggest themselves: the arbitrator's award might be reviewable to some unspecified extent, to ascertain whether the rights under §§ 596 and 597 have been adequately protected, or the claim may, in some fashion,

---

[3] In *Collie* v. *Fergusson,* 281 U. S. 52, 55 (1930), in discussing what constitutes sufficient cause for delay in payment under § 596, the Court noted that "the evident purpose of the section [is] to secure prompt payment of seamen's wages . . . and thus to protect them from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed."

be split, either by declining jurisdiction at the outset over the contract portion of the litigation, or by utilizing the various devices of abstention. Cf., *e. g., United States Steel Corp.* v. *Seafarers,* 273 F. Supp. 529 (ED Pa. 1965). As an abstract proposition, both options have the undesirable consequence of cutting substantially into the very exclusivity of the contractual forum which we said in *Maddox* is important to effectuation of the national labor policy favoring arbitration. See *Maddox, supra,* at 653. And the difficulties of analyzing the respective boundaries of the contractual right and the statutory right forbode ill for the efficient resolution of disputes implicating both the contract right and the federal statutory right. But the matter is not one to be decided abstractly; it may well be that certain types of federal statutory benefits will lend themselves to arbitration or splitting without an unacceptable sacrifice in competing policy interests.

However, this is not such a statute, because the very essence of the legislative policy at stake here is ensuring promptness in the payment of wages. I think it obvious that the least desirable of all solutions would be to create a necessity for suits in both forums. In this circumstance, I think conflicting congressional policies are best reconciled by construing 46 U. S. C. § 596 and § 301 of the Labor Management Relations Act as securing to the seaman an option to choose between arbitral and judicial forums where he states a claim under both the contract and 46 U. S. C. § 596.

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN, MR. JUSTICE STEWART, and MR. JUSTICE MARSHALL join, dissenting.

Respondent Arguelles is a seaman who signed onto the SS *U. S. Pecos,* a merchant ship owned by petitioner, on August 3, 1965, for six months' employment at a stated monthly wage. The employment relationship was

governed by the collective-bargaining agreement between petitioner and the National Maritime Union, AFL–CIO, of which respondent is a member.

On February 3, 1966, the day after respondent's shipping papers expired by their terms, the *Pecos* anchored off Cape St. Jacques, South Vietnam, awaiting authorization to proceed to Saigon harbor. Respondent concedes that congestion in the harbor was the cause of the extended wait offshore.[1] During this time, Saigon port officials refused to grant pratique, or quarantine clearance, to crew members. Nonetheless, respondent demanded discharge or shore leave, both of which were refused.[2] On February 13, the *Pecos* was authorized to, and did, proceed to the harbor and tie up at a designated location. Unloading of cargo began February 16, and the following day respondent and other crew members were discharged and given a voucher for their wages at the American Consulate in Saigon.[3] The voucher called for payment in American currency at petitioner's headquarters in Galveston, Texas. On February 18, respondent departed Saigon by air for Galveston, where he was paid in cash on February 22.

---

[1] Brief of Respondent in Opposition to Certiorari 1–2.

[2] Id., at 2. Article III, § 2, of the bargaining agreement provides overtime pay for restriction to ship except when shore leave is prevented by order of foreign governments. In such cases, the bargaining agreement requires the company to "produce a copy of the government restriction order when the crew is paid off." Respondent now seems to concede that the government's failure to grant pratique prevented shore leave, but alleges that "the captain failed to conform to the procedures required to show the crew that pratique (clearance) was refused by the S. Vietnam Government [Art. III, § 2 of Agreement . . .]." Respondent seems to imply, though this is far from clear, that the alleged failure of the captain to exhibit the order restores respondent's right to overtime wages.

[3] Petitioner asserts that "local currency restrictions" prevented payment in American currency in South Vietnam, and that use of vouchers was a "customary and accepted" means of payment in foreign ports.

While in Galveston, respondent notified the union's local office that he was dissatisfied with the company's refusal to honor certain wage, penalty, and miscellaneous claims.[4] The respondent was advised to contact his union representative with details, but instead of doing so, he brought this suit in the District Court under its admiralty and maritime jurisdiction, 28 U. S. C. § 1333. Respondent sought recovery on three claims which survive here: (a) overtime for work allegedly performed prior to February 3, 1966; (b) overtime for wrongful restriction to the ship for 11 days between arrival at Cape St. Jacques on February 3 and tying up in the port of Saigon on February 13 despite requests for shore leave;[5] (c) a statutory penalty of $254.95 under 46 U. S. C. § 596,[6] based on two days' pay for each day be-

---

[4] In addition to the three claims listed below, respondent also sought recovery in the Federal District Court for the difference between coach air fare and first-class air fare to which he was entitled under the contract, $6.50 as his share of a limousine from Houston airport to Galveston, and $8.50 excess baggage charge. The air fare claim was settled directly with the airline, and respondent apparently abandoned the other two claims during the course of the proceedings.

[5] See n. 2, *supra.*

[6] "The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made

tween February 3 and February 22, when respondent was paid at Galveston. Petitioner answered by alleging the failure of respondent to exhaust the grievance and arbitration procedures of the collective-bargaining agreement.[7] Petitioner contends that (a) the master did not

before the court; but this section shall not apply to masters or owners of any vessel the seamen of which are entitled to share in the profits of the cruise or voyage. This section shall not apply to fishing or whaling vessels or yachts."

[7] "ARTICLE II
"GRIEVANCES

"Section 1. Department Spokesmen. The Unlicensed Personnel of each department employed on board vessels operated by the Company shall have the right to designate a spokesman by and from that department. Any employee who feels that he has been unjustly treated or been subjected to an unfair consideration shall endeavor to have said grievance adjusted by his respective designated spokesman, in the following manner:
"*First*—Presentation of the complaint to his immediate superior.
"*Second*—Appeal to the head of the department in which the employee involved shall be employed.
"*Third*—Appeal directly to the Master.
"Section 2. Grievance Machinery. If the complaint cannot be settled to the mutual satisfaction of the employee and department head or the Master, the decision of the Master shall be supreme at sea and in foreign ports, and until the vessel arrives at the port where shipping articles are closed. Such complaint shall be settled through the grievance machinery of this agreement at the port where shipping articles are closed or at a continental American port where the Company maintains an operating office and the Union maintains an agent."

"ARTICLE XII
"ARBITRATION

"Section 1. Settlement of Disputes Prior to Arbitration. In case a dispute arises over the interpretation of any of the provisions of this agreement, whether the said dispute originates on board ship or ashore, the Union agrees to take the matter up with the Company and make every effort to adjust the said dispute. In the event that no amicable and satisfactory adjustment can be made between the Union and the Company and the question in dispute is deemed to

authorize any overtime work before February 3; (b) the restriction to ship between February 3 and February 13 was due to the failure of Saigon port officials to lift quarantine restrictions, and (c) because respondent was paid promptly by voucher at the American Consulate on the day of discharge, no penalty obtains.

The collective-bargaining agreement provides in relevant part that (a) no overtime work shall be performed without the authorization of the master (Art. IV, § 2); (b) with exceptions not relevant here, no overtime will be paid for restriction to ship when such restriction is

be sufficiently important to either party, the Union or the Company may present the question disputed to the Disputes Board for arbitration as provided herein.

.        .        .        .

"Section 3. Notwithstanding any of the foregoing, should a dispute or grievance arise under this agreement which, in the opinion of the President of the American Merchant Marine Institute or his designee or the President of the National Maritime Union or his designee, requires expeditious determination, such party may waive the grievance and arbitration provisions referred to above and request that the dispute or grievance be referred to arbitration as follows:

"(a) The dispute or grievance shall be asserted by notice in writing to the other party and to Theodore W. Kheel, the arbitrator under this agreement. Such notice shall contain a summary of the dispute or grievance and the reasons for requesting a waiver of the contract grievance procedure. Following the receipt of such request the arbitrator or his designee shall, upon the basis of the information submitted and any further information he may have requested from either party, determine whether the matter should be submitted to arbitration or referred back for processing under the regular grievance machinery. In the latter case, the arbitrator shall notify both parties of his decision and the grievance shall be processed as provided in Sections 1 and 2 of this Article. If the arbitrator or his designee should decide that the request to waive the regular grievance machinery should be granted, he shall so notify both parties and schedule the matter for prompt arbitration."

.        .        .        .        .

due to the regulation of government authorities (Art. III, § 2), and (c) a ship shall not be deemed to have arrived in port while it is awaiting quarantine clearance (Art. III, § 1 (c)).

The merits of respondent's nonstatutory claims depend entirely on interpretation and application of the bargaining agreement. Specifically, the threshold questions involved are (a) whether the respondent performed overtime work with the authorization of the master; (b) whether the crew was confined to ship because of the actions of government officials and if so whether respondent can base his claim on the alleged failure of the master to show the required documents to the crew, and (c) whether the ship had arrived "in port" on February 3, so that respondent was entitled to discharge and payment, or, in the alternative, whether the fact that respondent's shipping articles expired by their terms on February 2 entitled him to discharge against petitioner's claim that where the cargo is still aboard in such cases the articles are automatically extended. An additional question is whether respondent was "paid" on February 17 or February 22, since the penalty accrues only until the date of payment.

Most importantly, for purposes of this case, it is clear that the question of whether respondent was entitled to the statutory penalty depends entirely on a resolution of these questions. If it develops that petitioner has paid respondent all wages due him in a timely manner, the statutory penalty claim also disappears.

These questions are particularly within the competence of the contractually established grievance procedure of the collective-bargaining agreement. They are all questions of fact or interpretation of various provisions of the agreement. There is not the slightest indication or contention that the grievance machinery would be unable

to determine these questions, or that it would be inferior to a federal court in so doing. It is clear from the face of the claims that a familiarity with the customs and practices of shipping would be distinctly helpful in assessing the validity of the claims. This familiarity is, of course, one of the prime attributes of an arbitrator. As the Court said in *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U. S. 574, 582 (1960):

> "The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs. The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed."

In *Textile Workers v. Lincoln Mills*, 353 U. S. 448 (1957), it was held that federal courts have jurisdiction to specifically enforce the arbitration provisions of the collective-bargaining agreement. And it has been clear at least since *Republic Steel Corp. v. Maddox*, 379 U. S. 650 (1965), that absent extraordinary circumstances not

alleged here, contractual grievance procedures must be exhausted before suit can be brought.[8]

The collective agreement reveals that the parties intended all disputes and grievances, not merely those based on the contract, to be resolved if possible through the contractual procedure. Article II provides a three-step on-board grievance procedure for "[a]ny employee who feels that he has been unjustly treated or been subjected to an unfair consideration." If no satisfactory solution is reached on board, the parties are directed to proceed "through the grievance machinery of this agreement at the port where shipping articles are closed or at a continental American port where the Company maintains an operating office and the Union maintains an

---

[8] The language of the Court in that decision is pertinent here:

"Congress has expressly approved contract grievance procedures as a preferred method for settling disputes and stabilizing the 'common law' of the plant. . . Union interest in prosecuting employee grievances is clear. Such activity complements the union's status as exclusive bargaining representative by permitting it to participate actively in the continuing administration of the contract. In addition, conscientious handling of grievance claims will enhance the union's prestige with employees. Employer interests, for their part, are served by limiting the choice of remedies available to aggrieved employees. And it cannot be said, in the normal situation, that contract grievance procedures are inadequate to protect the interests of an aggrieved employee until the employee has attempted to implement the procedures and found them so.

"A contrary rule which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it. In addition to cutting across the interests already mentioned, it would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances. If a grievance procedure cannot be made exclusive, it loses much of its desirability as a method of settlement. A rule creating such a situation 'would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.'" (Citations omitted.) 379 U. S., at 653.

agent." Provisions are made for any party to a "dispute or grievance" to seek expeditious determination from the arbitrator. Art. XII, § 3. The parties made no provision whatever for excepting statutory penalty claims from the grievance machinery. Prior decisions unmistakably limit the role of the courts to determining whether a dispute is arguably covered under the arbitration clause. "In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad." *United Steelworkers* v. *Warrior & Gulf Navigation Co., supra,* at 584–585.

Nor until now has there been any principle that requires contract rights to be resolved internally but directs statutorily created remedies to be presented to the court, at least where, as here, the availability of the statutory remedy rests on disputed issues that are cognizable under the arbitration clause. In fact, this Court and lower federal courts have endorsed the suitability of arbitration to resolve federally created rights. In *Wilko* v. *Swan,* 346 U. S. 427 (1953), the Court expressed "hope for [arbitration's] usefulness . . . in controversies based on statutes . . . ." *Id.,* at 432. And courts of appeals both before and after passage of § 301 have required that Fair Labor Standards Act employees' claims for liquidated damages under 29 U. S. C. § 216 (b) for failure to pay overtime wages be referred to contractual grievance procedures before being presented to the court. *Donahue* v. *Susquehanna Collieries Co.,* 138 F. 2d 3 (CA3 1943); *Evans* v. *Hudson Coal Co.,* 165 F. 2d 970 (CA3 1948); *Beckley* v. *Teyssier,* 332 F. 2d 495 (CA9 1964). Cf. *Fallick* v. *Kehr,* 369 F. 2d 899 (CA2 1966); *Old Dutch Farms* v. *Local 584, I. B. T.,* 243 F. Supp. 246 (EDNY 1965);

*United States Steel Corp.* v. *Seafarers,* 237 F. Supp. 529 (ED Pa. 1965). That the question of penalties or liquidated damages should be referred in the first instance to applicable grievance procedures is especially proper where, as here, there are also underlying wage claims based on factual disputes, and whose resolution will determine whether, and to what extent, the penalty is due. Neither do I see any reason why the issue of the penalty would be unsuitable for arbitration even if the owner paid off all disputed underlying wage claims, leaving only the question of the statutory penalty. On the contrary, if respondent's claims are not reached by his promise to arbitrate, or if the promise to arbitrate is unenforceable, a master or owner could pay off wages in full, but grossly late, secure in the knowledge that the obligation to pay the penalty would not be susceptible of the quick and informal arbitration process, but must await the attention of a federal district court which may be thousands of miles away. Overreaching and delay were precisely the evils that § 596 was designed to reach. *Mavromatis* v. *United Greek Shipowners Corp.,* 179 F. 2d 310 (CA1 1950).

The Court tries to avoid this problem by holding that grievance procedures are available to the seaman to pursue if he chooses. The effect of this is to hold contractual remedies enforceable by the employee but not by the employer. This is not only a curious application of § 301 and contract principles but an unwise departure from past cases. In *Republic Steel Corp.* v. *Maddox, supra,* the Court foresaw that under such circumstances the employer, "to limit the modes of redress that could be used against him," would simply insist in future bargaining that suits for overtime pay [9] be eliminated from

---

[9] Though *Maddox* involved a claim for severance rather than overtime pay, "[g]rievances depending on severance claims are not critically unlike other types of grievances." 379 U. S., at 656.

the grievance procedure. The Court was entirely correct in surmising that "[t]he union would hardly favor the elimination, for it is in the union's interest to afford comprehensive protection to those it represents, to participate in interpretations of the contract, and to have an arbitrator rather than a court decide such questions . . . ." 379 U. S., at 656.

Nothing in the words of the statute warrants dispensing with contractual procedures. Section 596 provides that the penalty "shall be recoverable *as wages* in any claim made before the court." (Emphasis added.) The statute on its face makes the penalty a wage claim; it would in no way be in derogation of the statute to require this claim to be presented like any other wage claim. Under the principles of *Republic Steel Corp.* v. *Maddox, supra,* this means that the internal remedies must first be exhausted.

Even assuming, without conceding, that § 596 provides a direct route to federal courts on penalty claims, § 301 should at least require that the contractual bases for the penalty claim be settled by contractual methods before penalty claims may be adjudicated by the courts. The penalty statute is a direct descendant of 1 Stat. 133, passed in 1790. Section 596 has existed unchanged since 1915. Section 301, on the other hand, was enacted in 1947 as a farreaching measure designed to secure the enforcement of arbitration agreements in the federal courts in the belief that "industrial peace can be best obtained only in that way." *Textile Workers* v. *Lincoln Mills, supra,* at 455. Section 301 did away with common-law rules against enforcing executory promises to arbitrate, and there should be no reluctance to accommodate § 596 and the policy of § 301 by withholding judicial relief until contractual remedies are exhausted.

It should also be recalled that even though a dispute also involves an unfair labor practice or a representation

or jurisdictional dispute it is nevertheless not removed from the arbitral process. *Smith* v. *Evening News Assn.*, 371 U. S. 195 (1962); *Carey* v. *Westinghouse Corp.*, 375 U. S. 261 (1964).[10] Both the National Labor Relations Board and this Court have shown a high regard for the informed opinion of the arbitrator in such cases. *International Harvester Co.*, 138 N. L. R. B. 923, 925–926 (1962); *Carey* v. *Westinghouse Corp.*, *supra*, at 272.

Moreover, prior to the passage of § 301, nonmaritime employees, like seamen, could go to court to resolve disputes over the meaning of the collective-bargaining agreement. Given the basis for federal jurisdiction, they could go to federal court. In this respect they were no different from seamen. When § 301 provided for the enforcement of arbitration agreements and, as interpreted in *Maddox*, for exhaustion of internal remedies, there is not the slightest indication that Congress intended that seamen should be treated any differently from their nonmaritime counterparts.

Finally, it is pertinent to recall the words of the District Court in the instant case in granting summary judgment to the petitioner:

> "The policy established by the cases referred to, that matters of this sort should be left to procedures set up between the union and the employer, is, in the opinion of the Court, a most important policy lest this Court be inundated with small claims of the type which has been presented to the Court today." App. 55a.

---

[10] In *Carey* v. *Westinghouse Corp.*, *supra*, at 272, *Smith* v. *Evening News*, *supra*, was interpreted as approving "resort to a tribunal other than the Board" even though the tribunal in *Smith* was a state court. There was no internal grievance machinery established in the collective agreement in *Smith*.

In short, the Court today makes an unnecessary and ill-advised detour around the body of arbitration law developed by Congress and this Court. Its reasons for doing so, in my opinion, comport with neither the language of the statute nor considerations of sound labor and maritime policy.