**Daniel J. MANDO et al., Plaintiffs,**

v.

**Abraham BEAME et al., Defendants.**

**No. 74 Civ. 2576.**

United States District Court,
S. D. New York.

June 24, 1975.

National Employment Law Project, New York City, for plaintiffs.

W. Bernard Richland, Corp. Counsel of New York City, for defendants.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

Plaintiffs are employed by the City of New York and paid with federal funds granted pursuant to the Emergency Employment Act of 1971, 42 U.S.C. § 4871 *et seq.* (the "Act" or the "EEA"). Their amended complaint alleges that the City, in its administration of the EEA program, discriminates against its EEA employees, and in favor of its "regular", or locally funded employees, in violation of rights secured to them by the 14th Amendment of the Constitution, and the Act. Plaintiffs seek injunctive and declaratory relief pursuant to 28 U.S.C. § 2201 and § 2202 for themselves and all others similarly situated.[1]

A preliminary injunction was sought to prevent termination of employment of all New York City EEA employees on June 30, 1974 when federal funding of the program was scheduled to end. Additional federal funds were obtained under the Act, and on July 29, 1974, continued funding was approved pursuant to The Comprehensive Employment and Training Act of 1973, 29 U.S.C. § 801 *et seq.*, which superseded the Emergency Employment Act. The named plaintiffs continue to be employed by the City, and paid with federal funds. Preliminary

injunctive relief therefore became unnecessary.

A motion to intervene made by the American Federation of State, County and Municipal Employees, AFL–CIO, was denied on October 4, 1974, but the union was permitted limited participation in this litigation as *amicus curiae.*

Defendants now move pursuant to Rule 12(c), F.R.Civ.P., for an order dismissing the amended complaint for want of subject matter jurisdiction.

The stated legislative purpose of the Emergency Employment Act was [42 U.S.C. § 4871]:

> "to provide unemployed and underemployed persons with transitional employment in jobs providing needed public services during times of high unemployment and, wherever feasible, related training and manpower services to enable such persons to move into employment or training not supported under this chapter."

In periods of high unemployment, as determined by the administrator of the Act, the Secretary of Labor, he "shall enter into agreements with eligible applicants" [42 U.S.C. § 4875(b)] such as municipalities to provide funds for public service jobs and job training for unemployed or underemployed persons. Wages and benefits for EEA employees are to be equal to those of regular city employees doing the same work, and EEA employees are to enjoy working conditions and opportunities for advancement equal to those of regular city employees. Programs must be designed to contribute to the occupational development and "upward mobility" of the participants, to the end that the participants, if possible, can achieve permanent skilled employment with the city, or in private industry. [42 U.S.C. § 4876].

As a condition precedent to providing financial assistance to a municipality,

---

1. On September 24, 1974, plaintiffs filed a notice of motion pursuant to Rule 23(c), F.R. Civ.P., for an order allowing the action to proceed as a class action and defining the class.

The parties have agreed that a hearing of the class action motion should await determination of defendants' motion to dismiss the amended complaint.

the Secretary must determine that [42 U.S.C. § 4881(a)]:

"(2) persons employed in public service jobs under this chapter shall be paid wages which shall not be lower than whichever is the highest of (A) . . . ; (B) . . . ; or (C) the prevailing rates of pay for persons employed in similar public occupations by the same employer; . . . .

(4) all persons employed in public service jobs under this chapter will be assured of workmen's compensation, health insurance, unemployment insurance, and other benefits at the same levels and to the same extent as other employees of the employer and to working conditions and promotional opportunities neither more nor less favorable than such other employees enjoy; . . . ."

The Secretary has enacted comprehensive regulations, as authorized by § 4881(a) of Title 42. See 29 C.F.R. § 55.0, *et seq.* He is empowered to withhold funds if he finds any violation of any provision of the Act. Periodic reports are required of recipient employers.

Plaintiffs contend that New York City, despite its assurances to the Secretary, has not allowed EEA employees equal pay and benefits, and actively has prevented them from preparing for and taking civil service examinations which would enable them to move into permanent, unsubsidized municipal employment. These benefits are available to regular City employees, and therefore, plaintiffs argue, by treating them differently and arbitrarily, the City is violating the Act and depriving them of equal protection under the 14th Amendment. Plaintiffs bring their constitutional claim under the Civil Rights Act,

42 U.S.C. § 1983, with jurisdiction based on 28 U.S.C. § 1343(3). They also allege that jurisdiction over their statutory claims is conferred by 28 U.S.C. §§ 1331(a), 1337 and 1343(3) and (4).[2]

Defendants correctly point out that a claim of violation of the equal protection clause assumes discrimination against a class, rather than individuals. They claim that the plaintiffs' allegations

"are typical problems which inevitably arise in the [government] employer/employee context. Undoubtedly some other city employees, who are not EEA participants have similar problems. No policy has ever been established by the City in its administration of EEA so as to deny EEA employees training classes, holiday and overtime pay, raises, notice before shift transfers, eligibility for other examinations or accrued annual leave.

\* \* \* \* \* \*

The alleged deprivation raised by the named plaintiffs could just as easily have happened to regular non-EEA employees.

It is significant that the information about differential treatment was either hearsay or from [sic, probably to be read as 'received from'] low level personnel, foremen, course instructors, payroll clerks, etc., and did not reflect the City-wide policy concerning the effectuation of the EEA program." (Defendants' Brief, pp. 14–16)

█ Whatever these contentions may reveal concerning conditions of public employment in New York City, they do not settle the jurisdictional question. They present a factual issue, and we may accept the well pleaded allegations of the amended complaint for purposes of the instant motion.

**2.** At the hearing on this motion, it was assumed that no member of the purported class has a claim, the value of which is in excess of $10,000.00, within 28 U.S.C. § 1331. However, since persons employed in the classified service of the State of New York and its subdivisions may not be removed except for misconduct or incompetence after a hearing, or by reason of reduction of force (N.Y. Civil Service Law § 75, McKinney's Consol. Laws, c. 7), the right to such continued employment may indeed have a value in excess of $10,000.00. *Reeber v. Rossell,* 91 F.Supp. 108 (S.D.N.Y.1950); *Chaudoin v. Atkinson,* 494 F.2d 1323 (3rd Cir. 1974).

■■ A city, as an employer, is subject to the 14th Amendment. Its employment regulations must be related reasonably to a valid government interest in compliance with the due process clause, and classifications of employees which serve no rational purpose or which divide employees into classes and arbitrarily treat them differently, violate the equal protection clause. *Thompson v. Gallagher*, 489 F.2d 443 (5th Cir. 1974). Nor may public employees be dismissed for exercising constitutional rights, such as the Fifth Amendment privilege against self-incrimination [*Slochower v. Board of Education*, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956)], or First Amendment rights to free speech and association [*Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967)]. In *Thompson, supra*, the Court held [489 F.2d at 447]:

"Just as a public employee does not give up his First Amendment rights when he begins receiving a pay check from the government, neither does he give up his right to due process of law. The Fourteenth Amendment stands for the proposition that the government must act, when it acts, in a manner which is neither arbitrary nor unreasonable. This stricture is in addition to those which restrict the government from acting in a manner which impinges on freedom to speak or association, or to be free from self-incrimination. It is one which most certainly applies not only to the government as policeman but also to the government as employer. Public employees are every bit as protected by the Fourteenth Amendment's safeguards as is the rest of the populace [citations omitted]."

In *Rios v. Dillman*, 499 F.2d 329 (5th Cir. 1974), which upheld, against an attack on equal protection grounds, a preference given to City of El Paso employees who were veterans, the Court explained that its decision in *Thompson, supra*, did not compel a similar result in *Rios*. The Court noted [p. 333 n. 7 of 499 F.2d]:

"A statute that bars *all* employment has a substantially different effect from one that simply grants an advantage to some otherwise qualified for employment . . . ." [Emphasis in original]

■ Whether the plaintiffs' equal protection claim has merit cannot be decided now; we hold only that "within accepted doctrine [plaintiffs'] complaint allege[s] a constitutional claim sufficient to confer jurisdiction on the District Court to pass on the controversy" [*Hagans v. Lavine*, 415 U.S. 528, 538, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974)]; and the equal protection claim under 42 U.S.C. § 1983 is not "made solely for the purpose of obtaining jurisdiction . . . or . . . wholly insubstantial and frivolous" [*Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946)]. We have subject matter jurisdiction of that claim pursuant to 28 U.S.C. § 1343(3).

■ This being so, this Court may, as a matter of pendent jurisdiction, hear the statutory claim. [*Hagans v. Lavine, supra*, 415 U.S. p. 536, 94 S.Ct. 1372; *Rosado v. Wyman*, 397 U.S. 397, 402–405, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970)].

Defendants' contend that no such statutory claim exists because the Emergency Employment Act is not a statute which may be enforced by private litigants. The Act contains no express private remedy for an injured employee. We find only one reported case holding directly that a private right of action may be implied on behalf of individuals aggrieved by the method of administration of a grant received by a municipality pursuant to the Act.[3] In *Holliman v.*

---

3. There are two other reported cases dealing with rights of municipal employees' unions under the Act. *Illinois State Employees Union, Council 34 v. Hodgson*, 335 F.Supp. 960

*Price,* 7 E.P.D. 6510 (E.D.Mich., Jan. 3, 1974), Black and Spanish-surnamed unemployed and underemployed residents of Flint, Michigan sought an injunction barring city officials from using federal funds obtained pursuant to an agreement with the Secretary of Labor. Plaintiffs claimed they had been prevented from securing federally funded jobs as policemen because the city imposed arbitrary examinations, and educational and experience requirements as barriers to their employment, which operated to the disadvantage of plaintiffs and racial minorities generally. The Court held the plaintiffs had standing, and [7 E.P.D. 6514]:

"[m]oreover, a private right to sue to enforce the provisions of the Emergency Employment Act can easily be implied in favor of plaintiffs, the intended beneficiaries under the Act. It has been recognized on numerous occasions by a variety of jurisdictions that a federal statute (such as the EEA), enacted to protect or benefit a particular class of citizens, although not specifically authorizing members of the protected class to institute suit, nevertheless implied a private right of action. [Citations omitted.]

Although resort to analogy is unnecessary, the instant case is not totally unlike the myriad of federal cases in which private plaintiffs have sued to force compliance by recipient state and local agencies with federal statutory and regulatory requirements with respect to the use of funds supplied through a federal administrative agency. [Citations omitted.] Although the recipient agency in this case is a local unit of government and the funds are provided by means of a single grant rather than on a continuing basis, the principle is the same: intended beneficiaries of the funds under the federal statutory and regulatory scheme have a private right to sue to assure compliance by the local administrator with the federal guidelines governing disposition of the funds."

As defendants point out, *Holliman, supra,* was decided before *National Railroad Passenger Corp. v. National Ass'n of Railroad Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). Defendants say that in light of *National Railroad,* district courts should no longer follow an "almost automatic approach of implying a private right of action in favor of the intended beneficiaries of an act [of Congress]." (Defendants' Brief, p. 34)

In *National Railroad,* an organization of railroad passengers brought suit to enjoin discontinuance by Central of Georgia Railway Company of certain intercity passenger rail service. Pursuant to the Rail Passenger Service Act of 1970 (45 U.S.C. § 501 *et seq.,* the "Amtrak Act"), National Railroad Passenger Corporation (Amtrak) had entered into an agreement with Central to assume full responsibility for Central's intercity

(N.D.Ill.1971), holds that such a union may challenge the validity of an application for funds under the Act on the ground that the union was not notified of the application and afforded a reasonable period of time to make comments to the applicant and to the Secretary of Labor prior to the submission of the application, as required by 42 U.S.C. § 4881 (c). Also, *American Fed. of State, Cty. and Municipal Employees, AFL–CIO, Greater Cleveland District Council 78 v. City of Cleveland,* 484 F.2d 339 (6th Cir. 1973), concerned a challenge by a municipal employees' union of a directive of the Secretary of Labor limiting the number of laid-off union members

Cleveland could rehire with EEA funds in which plaintiff sought an injunction requiring Cleveland to rehire in accordance with seniority rights granted by a collective bargaining agreement. The Court did not question its authority to reach the merits of the case. Cf. *Evans v. Lynn,* (2d Cir. decided June 2, 1975), in which non-residents were held to have standing to sue the Secretary of Housing and Urban Development and the Department of the Interior asserting a failure to implement affirmative action provisions of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

passenger service. After entering into such an agreement, a railroad may discontinue intercity passenger service simply by filing a notice of intent with the Interstate Commerce Commission. Plaintiff claimed that the contract between Amtrak and Central did not comply with the Amtrak Act, and therefore Central lacked the statutory authority to discontinue passenger services.

The Amtrak Act provides that enforcement actions might be brought by the Attorney General of the United States or, in a case involving a labor agreement, by the affected employee [45 U.S.C. § 547(a)]. The Supreme Court held all other parties were precluded from bringing actions to enforce the Amtrak Act, not only on the basis of the specific enumeration of parties entitled to sue, but by clear legislative history. No new standard for determining when a private right of action may be implied, is found in *National Railroad*. The intent of Congress, the purpose of the statute and its plain language have always been the guides, and remain so. Also to be considered is whether the plaintiff is an intended beneficiary of the legislation. With regard to this last criterion, the Court said [p. 457 of 414 U.S., at p. 693 of 94 S.Ct.]:

> "The respondent claims that railroad passengers are the intended beneficiaries of the Act and that the courts should therefore imply a private cause of action whereby they can enforce compliance with the Act's provisions. See *J. I. Case Co. v. Borak*, 377 U.S. 426, 431–432, 84 S.Ct. 1555, 1559–1560, 12 L.Ed.2d 423 (1964). It goes without saying, however, that the inference of such a private cause of action not otherwise authorized by the statute must be consistent with the

> evident legislative intent and, of course, with the effectuation of the purposes intended to be served by the Act."

Having found a private cause of action not authorized, and inconsistent with the purposes of the Act, the Court denied the plaintiff the right to bring a private action.

The Emergency Employment Act contains no section comparable to 45 U.S.C. § 547(a) of the Amtrak Act naming parties who may sue. Therefore, plaintiffs are not precluded by the statute itself. The legislative history contains no reference to court enforcement by anyone, including the Secretary of Labor. See House of Representatives Report No. 92–176; Senate Report No. 92–48; Joint Conference Report No. 92–310, at 1971 U.S.Code Cong. and Admin.News 1171.

The Secretary of Labor's direction and control over the disbursement of federal funds is pervasive. He may withdraw or recoup funds from recipients who violate their agreements with him. It does not follow, however, that this indicates Congress intended the Secretary alone to enforce the Act. It appears from the Senate debates that strict control by the Secretary was desired to assure that funds would be used in communities most seriously affected to alleviate nationwide unemployment. Congress decided that the level of unemployment could best be monitored and the funds disbursed most equitably by the Secretary of Labor. See 117 Cong. Rec. 9337, *et seq.* The fact that the Secretary has broad responsibility for reviewing compliance by municipalities with EEA statutory requirements does not imply private litigants directly interested may not sue.[4]

---

4. See, e. g., *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970) (welfare recipients may challenge State statutory regulations even though Secretary of Health, Education and Welfare reviews state plans and may withhold federal funds for failure to comply with federal statute); *J. I. Case v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.

While the legislative history of the Emergency Employment Act is unenlightening on the subject of private rights of action, the question of legislative purpose is less difficult. Congress intended to provide unemployed persons with public service jobs during times of high unemployment. [42 U.S.C. § 4871] To implement this purpose, the Secretary of Labor is required, among other things, to establish procedures for periodic review of the status of each person employed under the Act, to assure that sufficient prospects for advancement are available, and that everyone who has received transitional employment under the Act receives assistance in securing a permanent job. [42 U.S.C. § 4880]

Employees must be advised of the rights and benefits available to them under the Act. [42 U.S.C. § 4881(a)(8)]

These sections, and the entire legislative scheme evince Congressional concern with individuals, rather than with reducing high unemployment as an abstract economic goal. The Act is intended to benefit unemployed persons and clearly, the plaintiffs are intended beneficiaries of the Act.

Defendant suggests that plaintiffs' action is barred because there are other remedies available to them, such as City grievance procedures or a state court action. But plaintiffs assert a federal right, and in such circumstances, may pursue their remedies in a federal forum. [See, e. g., *United States Bulk Carriers, Inc. v. Arguelles*, 400 U.S. 351, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971); *Galindo v. Del Monte Corp.*, 382 F.Supp. 464 (N.D.Ill.1974)].

Defendants' motion is in all respects denied.

So ordered.

2d 423 (1964) (stockholders may sue under § 14(a) of the Securities Exchange Act of 1934 despite enforcement authority of Securities and Exchange Commission).