MARINE TRANSPORT LINES, INC., a
Delaware Corporation, Plaintiff,

v.

The INTERNATIONAL ORGANIZATION
OF MASTERS, MATES AND PILOTS,
a labor organization, Defendant.

No. 84–1165–CIV–T–17.

United States District Court,
M.D. Florida,
Tampa Division.

July 2, 1991.

Terence G. Connor, Jean F. Reed, Miami, Fla., for plaintiff.

Frank Hamilton, Jr., Tampa, Fla., for defendant.

## MEMORANDUM OPINION

KOVACHEVICH, District Judge.

This matter came on for trial before this Court, sitting without a jury, July 18, 19, 20, 21, 25, 26, 27, and 28, 1988. Plaintiff, Marine Transport Lines, Inc., seeks a declaratory judgment as to the liability of Marine Transport Lines (hereinafter MTL) to pay double wage penalties pursuant to 46 U.S.C. Sec. 10313(g) to the International Organization of Masters, Mates and Pilots (hereinafter IOMM & P) on behalf of each person who executed an assignment of his claim to that organization.

This case was tried in 1988, and it is now 1991. The entry of this opinion was initially delayed when the parties sought extensions of time to file post-trial memoranda. Due to the increased caseload in the Middle District of Florida between 1988 and the present time, it was very difficult for the Court to return to this case for the completion of this opinion. The Court deeply regrets the long delay in this matter. However, after the close of the trial, the Court does recall encouraging the parties to resolve their differences in a reasonable manner. With the passage of time, due to the entry of opinions in other jurisdictions relevant to the subject of this dispute, it should have become abundantly clear what the Court's conclusions in this case would be. Nothing stopped the parties from resolving this matter between themselves, and the Court hopes the parties will be guided by common sense in the future.

After consideration of the testimony, both lay and expert, exhibits, pre-trial stipulation, and arguments of counsel, the Court makes the following findings of fact and conclusions of law. To the extent any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent any legal conclusions constitute a finding of fact, they are adopted as such.

## FINDINGS OF FACT

1. MTL is a Delaware corporation engaged in the business of carriage of goods

by sea. MTL operates, through various subsidiary companies, a fleet of U.S. flag vessels bearing cargo from port to port around the world. MTL is an operator of vessels as that term is used in 46 U.S.C. Sec. 10313. (Complaint, Paragraph 2; Pretrial Stipulation, p. 3).

2. The IOMM & P is an unincorporated association and a labor organization. Its members are merchant seamen. The IOMM & P was the collective bargaining representative of certain supervisory licensed deck officers and port relief officers employed on ships operated by MTL on foreign and intercoastal voyages. (Complaint, Paragraph 3, Pretrial Stipulation, p. 7).

## I. THE MASTER COLLECTIVE BARGAINING AGREEMENT

3. MTL recognized the IOMM & P as bargaining representative for its officers pursuant to a series of collective bargaining agreements until June 15, 1984, when it withdrew recognition.

4. MTL and the IOMM & P were parties to a series of agreements covering wages, hours and working conditions of licensed deck officers employed on MTL vessels. Until 1984, MTL negotiated these agreements through its representative, the Tanker Service Committee. (Oppenheimer, Vol. I, pp. 18–20; Murphy, Vol. I, pp. 15–20).

5. The last such collective bargaining agreement ("the Master Agreement") became effective June 16, 1981 and expired June 15, 1984. The Master Agreement provided for rate increases of 7.5% on each June 16th during the contract term, and for a cost of living allowance determined in accordance with the provisions of the Master Agreement. The cost of living increases were agreed on by the parties, and any disagreement over the final number was subject to arbitration under the agreement. (Plaintiff's Exhibit 1, p. 2).

6. On June 15, 1983, the parties adopted a Memorandum of Understanding amending the Master Agreement. The Memorandum indefinitely deferred the 7.5% increase which was due to become effective. In exchange for the deferrals, MTL agreed to

limitations on its ability to keep officers aboard beyond 120 days. This limitation required changes of crew more often and added a cost to MTL staffing which it would otherwise not have incurred. The IOMM & P retained the right to unilaterally recall that increase retroactively to the date of deferral. (Plaintiff's Exhibits 2, 3).

7. On June 5, 1984, IOMM & P President Robert Lowen sent all contracting companies, including MTL, a letter. The letter stated:

> This letter constitutes notice to you that, pursuant to Paragraph 6. of the Memorandum of Understanding dated as of June 16, 1983, the International Organization of Masters, Mates and Pilots hereby elects to reinstitute the wage, vacation, Cost of Living Adjustment, and all other increases that had been deferred pursuant to such Memorandum. This reinstitution shall be retroactive to June 16, 1983.

> Please let me know if you feel that a meeting would be necessary to facilitate the implementation of these increases.

(Plaintiff's Exhibit 4).

8. A copy of the same letter was remailed to MTL on June 7, 1984, certified mail, return receipt requested. (Plaintiff's Exhibit 5). At about the same time Lowen advised the employers who received the letter that it was not his intention to require these payments. (Murphy, Vol. I, pp. 148–151).

9. MTL has never contested the IOMM & P's right to impose the retroactive increases pursuant to the Memorandum of Understanding.

## II. PAYMENT OF SEAGOING AND PORT RELIEF OFFICERS DURING THE RELEVANT PERIOD

10. All seagoing licensed deck officers employed by MTL between June 16, 1983 and June 15, 1984 were paid all wages owed to them at the termination of their voyages or shipping articles as provided in the Master Agreement. (Pretrial Stipulation, p. 12).

11. Seagoing officers were paid by the master of the vessel from case provided to the master for this purpose. The officers signed a voucher upon payment, agreeing to the amount of the payment, and acknowledging payment in full at the termination of the voyage. (Perillo, Vol. IV, pp. 10–16; Plaintiff's Exhibit 33(a), Defendant's Exhibit 5).

12. Any disputes over the correct amount of payment were adjusted through the grievance procedure in the Master Agreement. Money which was determined to be due and payment in settlement of such grievances was paid from MTL headquarters. (Perillo, Vol. IV, pp. 18–19; Lowen, Vol. VIII, pp. 52–54, Plaintiff's Exhibit 1, Article IX, Paragraph 7).

13. All port relief officers employed by MTL between June 16, 1983 and June 15, 1984 were paid the wages required by the Master Agreement for service aboard MTL vessels. (Pretrial Stipulation, p. 13, Paragraph 13).

14. Port relief officers do not sign articles or serve on voyages, but only "stand watch" aboard the vessel while it is in port. Under the Master Agreement, port relief officers are assigned to the vessel by the IOMM & P local port office, and paid by that office at the conclusion of each "watch." (Pretrial Stipulation, p. 12, Paragraphs 9–10; Murphy, Vol. I, pp. 121–24; Brumley, Plaintiff's Exhibit 91(a), pp. 34–43; Dunham, Plaintiff's Exhibit 92(a), pp. 51–57).

15. The parties adopted a trust agreement pursuant to Section XXVIII of the Master Agreement. The trust agreement survived the expiration of the collective bargaining agreement on June 15, 1984. Pursuant to the trust agreement, MTL was required to deposit money in advance with the Vacation Plan in amounts required by the Plan trustees so that money would be available to pay port relief officers at the IOMM & P port office at the completion of their watch. (Oppenheimer, Vol. 1, pp. 27–28; Plaintiff's Exhibit 1, p. 5; Plaintiff's Exhibit 26; Defendant's Exhibit 2, Section XXVIII, 21 1(a)).

16. The Vacation Plan Trust Agreement authorizes the Plan to "hold funds for the accounts of the various employers, to be utilized for the payment of wages and taxes, and to act as agent of the employers in the payment of such wages." The Trust Agreement also authorizes the trustees to file suit to collect amounts due from MTL or any contributing employer. (Pretrial Stipulation, p. 12; Korba, Vol. V(a), pp. 142–44; Plaintiff's Exhibit 26,; Defendant's Exhibit 1, p. 2).

17. As the IOMM & P Plan made payments to port relief, officers, it billed the various companies to replenish their deposits. Surplus funds received from these employers, including MTL, were held in interest-bearing accounts which commingled deposits of the various participating employers. These funds were applied to cover payments to port relief officers, even when employing companies were delinquent in making payments into the fund. (Korba, Vol. V(a), pp. 94–98, 150–55, 180–81; Plaintiff's Exhibit 100, p. 8; Sokolowski, Plaintiff's Exhibit 97, pp. 25–28, 31–40).

18. MTL always paid the amounts requested to replenish the fund, and paid amounts billed, even after it withdrew recognition of the IOMM & P in June, 1984. (Perillo, Vol. IV, pp. 21–23, 29; Korba, Vol. VI, p. 35; Murphy, Vol. I, p. 125; Sokolowski, Plaintiff's Exhibit 97(a), p. 37).

III. RETROACTIVE RATE INCREASES

19. During the bargaining relationship of the parties, retroactive rate increases were negotiated on three occasions, and the evidence establishes that retroactive rate increases were required by adoption of the 1975, 1978 and 1981 Master Agreements. (Murphy, Vol. I, pp. 118–20; Vol. III, pp. 153–55; Perillo, Vol. IV, pp. 23–28; Korba, Vol. VI, pp. 6–7; Plaintiff's Exhibit 38, 39, 41, 55, 66–72).

20. In each case of retroactively imposed increases, payments were made to seagoing officers by the companies, and to the port relief officers by the IOMM & P Vacation Plan. MTL and the other companies paid seagoing officers those amounts from their company headquarters, weeks

or months after they became due, and did so without complaint from the IOMM & P or its members. (Murphy, Vol. I, pp. 120–21, 125–27, 175; Vol. III, pp. 157–58; Korba, Vol. V(a), pp. 129–30, 134, 167–68; Perillo, Vol. IV, pp. 25–27, 115–16; Korba, Vol. VI, pp. 25–30; Plaintiff's Exhibit 38, p. 2).

21. Retroactive payments calculated for port relief officers were made by the IOMM & P Vacation Plan weeks or months after they became due. After hearing from the IOMM & P of the retroactive rates, the Vacation Plan calculated and paid those amounts to the port relief officers before billing the companies for replenishment of the accounts. Although IOMM & P witnesses asserted that they required explicit employer authorization to make such payments, they admitted they had never received authorization for past retroactive increases. (Korba, Vol. V(a), pp. 161, 165; Vol. VI, pp. 7–8, 11, 18; Murphy, Vol. III, pp. 126–28; Plaintiff's Exhibits 38, 68; Sokolowski, Plaintiff's Exhibit 97(a), pp. 40, 60, 82, 83).

22. As to earlier retroactive increases, at no time did any officer, the IOMM & P Plans or the IOMM & P take the position that the retroactive payments were due within a time certain after the effective date of the increases. The IOMM & P Plans made payment to port relief officers "in the normal course," which took weeks or months to complete. (Oppenheimer, Vol. I, pp. 50–51; Korba, Vol. VI, pp. 6–7; Lowen, Vol. VIII, p. 46; Plaintiff's Exhibits 54, 55).

23. The system of payment of increases to port relief officers from the IOMM & P Plan remained in effect after expiration of the 1981–84 Master Agreement and MTL remained bound to the trust agreements for payment to the port relief officers after the expiration date. (Plaintiff's Exhibit 26; Defendant's Exhibit 1, p. 2; Korba, Vol. V(a), p. 144).

## IV. CONTEMPORANEOUS REINSTITUTION OF DEFERRAL AND OFFER OF WAIVER

24. In May of 1984 MTL labor representative Thomas Murphy attended a Tanker Service Committee meeting at which Committee Counsel Mr. Oppenheimer reported that the IOMM & P would be sending a letter reinstating the deferred increases, but Oppenheimer said Lowen indicated the purpose of the letter would only be to preserve the members' right to those increases after expiration of the Master Agreement, and that payment was not sought. (Murphy, Vol. I, p. 160; Vol. II, p. 41).

25. On June 5, 1984, Capt. Lowen sent the letter to all companies who were party to the tanker service and dry cargo collective bargaining agreements. In that letter, he stated that the IOMM & P "hereby elects to reinstitute the wage, vacation, Cost of Living Adjustment, and all other increases" which had been deferred by the June 15, 1983 Memorandum of Understanding. The letter did not state a date by which payment must be made, and it invited a meeting to "facilitate the implementation of these increases." (Plaintiff's Exhibit 4).

26. In May or June 1984, Mr. Oppenheimer, who was also at the time counsel to TSC members, including MTL, called Mr. Lowen, to inquire whether, in sending the "reinstitution" letter, Lowen intended to require the companies to make immediate payment. The substance of that phone call is disputed. Mr. Oppenheimer testified that he understood that Lowen did not want immediate payment, and that is what he told his clients. Upon receipt of the June 5 letter, Murphy inquired and learned of that communication. (Oppenheimer, Vol I, pp. 40–42, 47–48, 73, 89; Murphy, Vol. I, pp. 149–51; Vol. II, p. 41; Lowen, Vol. VI, pp. 100–02).

27. Between June 5, 1984 and August 22, 1984 no company which received the letter made payment of the increases mentioned in that letter, and neither the IOMM & P nor any of its members took action to require time-certain payment or to notify the companies of their intent to do so. (Lowen, Vol. VII, pp. 197–98; Korba, Vol. VI, pp. 13–14, 41–42; Oppenheimer, Vol. I, pp. 42, 90; Plaintiff's Exhibit 4).

28. Lowen testified that on June 5, 1984 he provided a copy of the letter to IOMM & P Plan Administrator John Sokolowski so that Sokolowski could take any action necessary to requirement of the retroactive increases. At deposition Sokolowski testified that his office is down the hall from the Plan office and he regularly communicated with Lowen on those issues. Sokolowski's assistant, George Korba, also testified to this at trial. Sokolowski did nothing to effect payment to the port relief officers or to advised the companies that the port relief officers must be paid by a time certain. The Plan witnesses admitted they had an obligation as agents of the employers, including MTL, to advise the companies of any obligation to pay the increases. (Sokolowski, Plaintiff's Exhibit 97(a), pp. 104–05, 129, 167–68; Korba, Vol. VI, pp. 13–14; Plaintiff's Exhibit 4).

29. On June 5, 1984, Captain Lowen wrote the letter to "all offshore companies" covered by the agreement, including MTL, advising them of his intention to reinstitute rate increases. On June 6, 1984, Captain Lowen offered permanent waiver of that increase to employers who would continue to bargain with IOMM & P. Lowen also testified that the union was not "prepared to move forward" with the collection of the monies while the possibility of a new contract existed, and in fact no company that received the letter paid the increases until it was apparent that a new agreement would not be reached. Several companies who did not sign new agreements made the retroactive payments, but did so at a later time. (Lowen, Vol. VII, p. 189; Defendant's Exhibit 18; Plaintiff's Exhibit 22–25).

30. The IOMM & P permanently waived the increases mentioned in Lowen's June 5, 1984 letter for each company that executed a collective bargaining agreement with the IOMM & P in 1984, whether individually or as part of a multiemployer group. No money was paid to the officers as a result of that June 5, 1984 letter by any of those companies. (Oppenheimer, Vol. I, pp. 41–45, 60–62, Lowen, Vol. VII, pp. 210–18, Vol. III, pp. 3–34; Plaintiff's Exhibit 17).

31. The IOMM & P took the position with MTL that the expiring contract "self-renewed" on June 16, 1984 because MTL had not given notice of its intent to renegotiate. MTL and IOMM & P filed suit in the District Courts of Pennsylvania and New York to obtain an authoritative resolution of that issue. The IOMM & P instructed its members to remain aboard and work on MTL vessels even without a contract. (Murphy, Vol. I, pp. 162, 171; Plaintiff's Exhibit 15, 16, 62, 63).

32. Between June 15, 1984 and the end of July, 1984, MTL was aware of the IOMM & P position that MTL had a continuing bargaining obligation, of Lowen's statement to Mr. Oppenheimer that he did not require immediate payment, and of the IOMM & P's offer of waiver of any increases to parties who entered into new agreements with it. (Murphy, Vol. I, pp. 172–75; Vol. II, pp. 165–66).

33. Between June and October, 1984, the IOMM & P took several actions that were intended to persuade or compel MTL to recognize and bargain with IOMM & P. MTL believed that if it were required to resume bargaining, it would also obtain waiver of the 7.5% deferred increases. (Murphy, Vol. II, pp. 27–28; Vol. III, pp. 162–64; Lowen, Vol. VII, pp. 168–70, 194; Plaintiff's Exhibits 64, 65).

34. The Court finds that by his letter of June 5, 1984, Lowen did not request or intend to request, payment of money within any time certain, and that Lowen intended to use the possibility of that increase to encourage MTL and others to enter into a new collective bargaining agreement.

35. The Court further finds that the practice between the parties left the time of payment of the retroactive increases largely up to the companies, and that the union could not treat its June 5, 1984 letter as triggering a requirement for immediate payment without explicit demand to that effect.

36. The Court further finds that any determination that the contract provides for immediate payment without explicit demand must be established in an arbitration proceeding, pursuant to the contract. The

Court also finds that any dispute over the amount of COLA to be required is to be determined in an arbitration proceeding pursuant to the collective bargaining agreement. Since that process was never invoked, MTL has no contractual obligation to pay more that its view of the amount required by the contract, 1.3%.

37. The Court also finds that the payments at issue were not required to be paid "at the end of a voyage" and remained contingent on the IOMM & P's bargaining objectives. They were at all times subject to waiver or deferral by Defendant.

## V. ASSIGNMENT AND POWER OF ATTORNEY

38. The IOMM & P took no action to advise MTL that it wanted immediate payment of the retroactive increases described in its June 5, 1984 letter, and had informed industry representatives that it did not want payment. Beginning on or about June 12, 1984, it solicited the execution of "assignments for value" and "powers of attorney" of the claims of its members who worked for MTL. Captain Lowen testified that the purpose of the assignments was to enable collection of the increases from employers who "refused" payment. There is no evidence that MTL was aware of these assignments until one of the officers, Delmar Winchester, disclosed them to MTL. (Murphy, Vol. II, p. 131; Lowen, Vol. VII, pp. 204–05; Plaintiff's Exhibits 9, 10).

39. IOMM & P members testified that the solicitation of an assignment from them led them to believe that the retroactive increases would be paid to the union, or that MTL had refused to make payment, and the IOMM & P required the assignments in order to effect collection. (Brumley, Plaintiff's Exhibit 91(a), pp. 27–30; Dunham, Plaintiff's Exhibit 92(a), pp. 26–28, Plaintiff's Exhibit 46).

40. Without making demand for payment by any time certain, the IOMM & P solicited and obtained assignments from certain officers, and proceeded with plans to arrest MTL vessels on their behalf, but without their knowledge. (Brumley, Plaintiff's Exhibit 91(a), pp. 42–43; Dunham,

Plaintiff's Exhibit 92(a), pp. 39–40; Schubert, Plaintiff's Exhibit 93(a), pp. 4–5, 40–42; Hobbs, Plaintiff's Exhibit 95(a), pp. 51–52; Plaintiff's Exhibit 4).

41. The vessel arrests were based on claims that MTL had refused to pay the officers' wages due within 24 hours of discharge of cargo or 4 days from discharge of the seamen at the end of a voyage. (Lowen, Vol. VII, pp. 206–07).

42. The arrest of the vessels was one of a number of actions, including strikes and picketing, taken by the IOMM & P during the course of the summer and fall of 1984, that were intended to induce or force MTL to return to the "bargaining table" for negotiations and a new agreement. (Lowen, Vol. VII, pp. 168–70, 194–95; Plaintiff's Exhibit 78, pp. 42–45).

43. MTL initiated this action, asserting that the Court had jurisdiction to adjudicate the statutory claims of officers who had "assigned" their claims to the IOMM & P. No officer intervened in his own name, and the Court finds that for purposes of the penalty claim, the IOMM & P has been authorized to represent only those officers whose assignments were produced to MTL upon request, and whose names are included on Plaintiffs' Exhibit 74.

## VI. CALCULATION AND PAYMENT OF THE RETROACTIVE INCREASES

44. In late July or early August, 1984, Thomas E. Murphy, labor relations representative of MTL, instructed Biagio Perillo, MTL's payroll manager, to begin calculation and payment of the 7.5% deferred increase. (Murphy Vol. I, p. 174; 1 Perillo, Vol. IV, pp. 32–35).

45. Undisputed documentary evidence confirms that Mr. Perillo had begun the recalculation process before August 15, 1984, and before the IOMM & P took any action to arrest MTL vessels on behalf of the assigned officers. This was the first time the MTL was required to pay retroactive increases for both seagoing and port relief officers, and the complicated and time-consuming process involved calcula-

tion and payment of one full year of retroactive pay for some 335 officers. (Murphy, Vol. I, p. 177; Vol. III, p. 130; Perillo, Vol. IV, pp. 28, 44–45; Plaintiff's Exhibit 13).

46. That procedure was interrupted by the arrest of two of MTL's vessels by the IOMM & P attorneys, acting pursuant to the assignments. Although the arrest actions purported to be initiated by several officers who served aboard those vessels during the relevant year, none of the officers were aware that the actions had been filed, or that the IOMM & P had retained counsel for them. They procured the arrest of the Marine Duval in Tampa, Florida, and of the Marine Chemist in Houston, Texas on August 22 and 23 of 1984 respectively, and sought bonds of several million dollars for the release of the vessels. Neither court imposed such a bond, but the evidence establishes that it was the IOMM & P's intent to make repeated arrests in various ports in an attempt to "get MTL's attention" and to force MTL to recognize the IOMM & P for collective bargaining. (Murphy, Vol. I, pp. 174–79; Lowen, Vol. VII, pp. 202–204; *See* Plaintiff's Exhibit 78).

47. After the arrest of the MTL vessels on August 22 and 23, 1984, and despite the fact that its payroll manager was out of the country at the time, MTL assembled its headquarters personnel in Secaucus, New Jersey, for the purpose of attempting to calculate and pay the 7.5% increase as quickly as possible from hastily assembled records. Checks were issued from MTL headquarters during the last week of August, 1984. The checks were sent to the seagoing officers where MTL had current addresses, but were sent to the IOMM & P Vacation Plan for distribution to port relief officers where MTL had no current addresses available. (Murphy, Vol. I, pp. 175–77; Perillo, Vol. IV, pp. 35–37, 43; Plaintiff's Exhibit 57).

48. The IOMM & P Vacation Plan retained the checks received from MTL, delaying payment while it considered whether to send the checks to the affected port relief officers, but it ultimately did send those checks. (Sokolowski, Plaintiff's Exhibit 97(a), pp. 114–17).

## VII. COST OF LIVING ALLOWANCE

49. The IOMM & P did not invoke a cost of living allowance under the Master Agreement in December of 1983 as had been its normal practice and the practice of other unions operating under similar contractual language. (Oppenheimer, Vol. I, pp. 51–52; Murphy, Vol. I, pp. 133–35; Vol. II, pp. 5–8, pp. 78–79; Plaintiff's Exhibits 2, 3, 34).

50. In his June 5, 1984 letter, Captain Lowen advised the offshore companies that it (IOMM & P) was "reinstituting" a cost of living increase that had been previously deferred, even though the deferral Memorandum of Understanding of June 15, 1983 did not address cost of living allowances. (Plaintiff's Exhibits 2, 3, 4).

51. When MTL issued checks for retroactive increases in August 1984, it had not received the customary notice concerning the COLA. The Marine Engineers Benevolent Association, the other officer union with a similar deferral and "reinstitution" agreement had intentionally remained silent and not collected a COLA. The checks issued by MTL did not include any amount for COLA. (Murphy, Vol. I, pp. 133–35; Vol. II, pp. 5–8).

52. In the course of testimony in a hearing in this case involving a motion for preliminary injunction, the COLA question arose. Until that time MTL and the IOMM & P had not discussed a 1983 COLA, and at that time disagreed and still disagree as to the amount applicable to COLA under the contractual language. (Oppenheimer, Vol. I, p. 52; Murphy, Vol. II, pp. 7–8, 18–25; Plaintiff's Exhibit 21).

53. Under the MTL contract with the National Maritime Union (NMU), containing language that is substantively identical to that in the Master Agreement with IOMM & P, MTL had paid a cost of living allowance for December 1983 which was 1.3%. In September 1984, Murphy instructed MTL representatives to calculate an additional amount for IOMM & P members for the relevant period, and to issue checks

representing a 1.3% cost of living allowance to those officers for whom it was applicable. (Oppenheimer, Vol. I, pp. 52–60; Murphy, Vol. I, pp. 134–35; Vol. II, p. 8; Vol. III, pp. 101–02; Korba, Vol. V(a), pp. 134–36, 141–42; Plaintiff's Exhibits 21, 22, 23, 24, 25, 34, 35, 76).

54. In September, 1984, after learning of the large number of assignments of claims to the IOMM & P, MTL requested from IOMM & P counsel a list of all its members who executed assignments. It sought these documents so that it could determine where checks should be sent. After failing to receive timely response to that request, MTL sent letters to IOMM & P counsel, advising them of the recalculation of retroactive amounts and including the amount required for a 1.3% COLA. This letter advised the IOMM & P members that the company was ready to pay the officer or the IOMM & P, as assignee, immediately upon directions from them after advising the IOMM & P. Certain officers advised MTL that they had not executed assignments, and MTL paid them after advising IOMM & P of the officers' letters. (Murphy, Vol. II, pp. 10–11, 17–18; Vol. III, pp. 101–08; Perillo, Vol. IV, p. 37; Plaintiff's Exhibits 46, 47).

55. In December, 1984, after correspondence from counsel for MTL to IOMM & P counsel, seeking assurance that payment of the officers was appropriate, MTL issued checks to the members in the amounts it believed to be due for the 1.3% COLA. It also corrected for any overpayments or underpayments made in the rush to issue checks after the arrest of the Marine Duval. (Perillo, p. 46; Plaintiff's Exhibit 46).

56. At about the same time the IOMM & P accepted 1.3% as the COLA contribution from other employers bound by the same agreement and made no effort to collect additional amounts. It also failed to seek resolution of the COLA dispute through the grievance arbitration procedures under the collective bargaining agreement, although they were aware that this was the appropriate course. (Lowen, Vol. VI, p. 159; Korba, Vol. V(a), pp. 134–36, 141–42; Plaintiff's Exhibits 22, 23, 24).

57. In February, 1985, solely to permit the filing of a motion for summary judgment in this Court, and in related litigation in Houston, MTL sent checks to MM & P members for an additional .7% COLA. (Murphy, Vol. II, pp. 26–27; Perillo, Vol. IV, p. 47).

58. The motions for summary judgment were not granted, and the parties remain in dispute over the correct percentage for the cost of living allowance. Where subsequent corrections to payments have been made, MTL has paid the 1.3% figure. (Perillo, Vol. IV, pp. 47–48; Plaintiff's Exhibit 21).

## VIII. NO WILLFUL REFUSAL TO PAY

59. With the exception of the contested COLA figure, at no time from June 5, 1984 to the present has MTL contested or refused to pay the retroactive amounts claimed by the IOMM & P to be due in this matter. (Lowen, Vol. VII, pp. 199–200).

60. Since late July, 1984, MTL made repeated offers to correct any mistaken calculations that the IOMM & P, the Vacation Plan or its members brought to MTL's attention, and has spent hours with IOMM & P counsel, reviewing the company records for that purpose. (Murphy, Vol. III, pp. 120–22; Perillo, Vol. IV, pp. 77–779; Vol. V(a), pp. 50–54; Plaintiff's Exhibit 47).

61. During the course of this litigation, MTL has made adjustments to payments in every case where the IOMM & P demonstrated that MTL's earlier calculations were in error, and it continues to keep that offer open to IOMM & P members. (Perillo, Vol. IV, p. 82; Vol. V(a), pp. 54–59; Plaintiff's Exhibits 47, 98).

62. MTL offered a summary exhibit at trial that establishes payment by MTL of every officer in the bargaining unit in the amounts required by the 7.5% increase and 1.3% COLA. The Court finds that MTL consistently made efforts to assure itself that every officer was paid in the correct amounts, and that MTL both opened its records to IOMM & P for scrutiny and sought that organization's help in uncovering any errors. The IOMM & P did not

contest the accuracy of that summary Exhibit (Plaintiff's Exhibit 75) and the Court therefore finds that all officers have been paid the 7.5% increase and a 1.3% COLA.

63. The IOMM & P has repeatedly failed to acknowledge the existence of records in its possession, custody, or control, which might have assisted MTL representatives in uncovering any mistakes in payment. (Perillo, Vol. IV, pp. 59–70; Plaintiff's Exhibit 47).

64. The Court finds no evidence that MTL willfully refused to pay any amounts claimed by the IOMM & P or its members, and finds that it has paid all undisputed amounts due under the collective bargaining agreement as amended.

65. The Court finds that MTL did not act willfully or arbitrarily to deny the officers wages. Its payment of the officers in August and September were well within the time period within which earlier retroactive increases were paid, and other delays that occurred resulted from disputes over amounts, confusion over the IOMM & P's intentions, and clerical errors that MTL tried in good faith to correct.

66. The Court further finds that any delays by MTL in paying the increases resulted from confusion over the status of the parties' relationship, clerical errors caused by haste and the use of unfamiliar personnel as well as questions as to what amounts were required. MTL's repeated offers to open its records and review documents submitted by the union are not consistent with any finding that MTL arbitrarily withheld money from its officers.

## CONCLUSIONS OF LAW

### Jurisdiction

1. This Court has jurisdiction over this action for seamen's wages under 28 U.S.C. § 1333. *U.S. Bulk Carriers v. Arguellas*, 400 U.S. 351, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971).

2. Defendant seeks penalty wages pursuant to 46 U.S.C. § 10313(f) and (g), which provide:

(f) At the end of a voyage, the master shall pay each seaman the balance of wages due the seamen within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged and final payment of wages is delayed for the period permitted by this subsection, whichever is earlier. When a seaman is discharged and final payment of wages is delayed for the period permitted by this subsection, the seaman is entitled to at the time of discharge to one-third of the wages due the seaman.

(g) When payment is not made as provided under subsection (f) of this section without sufficient cause, the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed.

### Penalty Statute Not Applicable to Subject Payments

3. The retroactive payments at issue in this case were not required to be paid within the statutory time period specified in the penalty statute. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982); *Kowalik v. General Marine Transport, Inc.*, 550 F.2d 770, 771 (2d Cir.1977). These issues remained negotiable at the will of the IOMM & P, and they are therefore not vested "wages" as that term is used in the penalty statute. *Larkins v. Hudson Waterways Corp.*, 640 F.2d 997, 1000 (9th Cir.1981).

4. The Court further concludes that the penalty wage statute does not apply to the persons serving as port relief officers, who did not sign articles of employment or go to sea with a vessel. Port relief officers were not exposed to the dangers against which the penalty statute protects. *Compton v. Alton Steamship Co.*, 608 F.2d 96 (4th Cir.1979).

### Determination of Existence of Sufficient Cause

5. If the statute did apply to the subject payments, the Court finds that assessment of penalties in this case is not appropriate. In order to recover double wage penalties, two requirements must be met. The master or owner must have refused to pay the seaman his wages within

the periods specified, and this failure must be without sufficient cause. *Cohen v. S/S Consumer,* 746 F.2d 1069 (5th Cir.1984).

■ 6. The penalty is mandatory if a shipowner withholds payment of wages without sufficient cause. *Escobar v. S.S. Washington Trader,* 503 F.2d 271 (9th Cir. 1974), cert. granted, judgment vacated *sub nom. American Trading Transportation Co. v. Escobar,* 423 U.S. 1070, 96 S.Ct. 852, 47 L.Ed.2d 80 (1976).

■ 7. A wrongful withholding alone does not establish the absence of sufficient cause. *Swain v. Isthmian Lines, Inc.,* 360 F.2d 81, 83 at n. 5 (3d Cir.1966).

8. The penalty is assessed only when the delay in payment is somehow arbitrary or unreasonable. *Collie v. Fergusson,* 281 U.S. 52, 55, 50 S.Ct. 189, 191, 74 L.Ed. 696 (1930). Other labels applied to penalty claims include "willfull, unwarranted, unjust or unscrupulous, or 'a failure not attributable to the impossibility of payment.'" The Court finds that none of those terms are applicable to this case.

*Question as to Amount of Wages*

9. The Court finds that there was a legitimate dispute between the parties as to the date the retroactive payments were required, and as to the amount of the COLA required by the contract. This precludes any finding that delay in payment was without sufficient cause. *Pacific Mail v. Schmidt,* 241 U.S. 245, 36 S.Ct. 581, 60 L.Ed. 982 (1916); *Dendrinos v. City of New York,* 86 F.Supp. 688 (S.D.N.Y.1949).

*Good Faith of Vessel Owner Shows Not Without Sufficient Cause*

■ 10. In addition to the presence of a genuine dispute as to amount, Plaintiff has established that the actions taken by Plaintiff in response to the demands of Defendant were performed in good faith. Any computational error in issuing the checks arose as a result of Plaintiff's attempt to meet the wage demands of Defendant, while the comptroller responsible for that function was unavailable. Plaintiff used other personnel to complete a complex transaction, and numerous errors were made that required later correction. These

payments were delayed in processing, but the delay was not arbitrary or unreasonable. *Livanos v. Pateras,* 192 F.2d 319 (4th Cir.1951); *Korinis v. Sealand Services, Inc.,* 490 F.Supp. 418 (S.D.N.Y.1980).

Accordingly, it is

ORDERED that a final judgment in favor of Plaintiff and against Defendant be entered.

DONE and ORDERED.