Allen Lane WILKINS, Plaintiff-Appellee,

v.

P.M.B. SYSTEMS ENGINEERING, INC., Defendant-Third Party Plaintiff-Appellant,

v.

BOB HENDERSHOT CONSULTANTS, INC., Defendant-Appellee,

Otis Engineering Corporation and Aquatic Equipment & Engineering, Inc., Third Party Defendants-Appellants Appellees,

Richard L. Eustace, Third Party Defendant-Appellee.

No. 83–2017.

United States Court of Appeals, Fifth Circuit.

Sept. 17, 1984.

Oxford, III, Beaumont, Tex., for Otis Engineering.

Bracewell & Patterson, B. Thomas Cook, Houston, Tex., for P.M.B.

Weitinger, Steelhammer & Tucker, Don Weitinger, L. Keith Slade, Houston, Tex., for Aquatic Equipment.

Fairchild, Price & Russell, Grover Russell, Jr., Center, Tex., for Allen Lane Wilkins.

Dale Dowell, Beaumont, Tex., for Bob Hendershot Consultants, Inc.

John D. Rienstra, Jr., Beaumont, Tex., for Richard L. Eustace.

Before BROWN, REAVLEY and WILLIAMS, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

■ This is an appeal of a seaman's personal injury suit against various defendants. Two of the defendants settled with the plaintiff in return for a Mary Carter agreement providing for their reimbursement from any recovery the plaintiff might later have from the non-settling defendants. We find the trial court's holding 553 F.Supp. 201, after trial that one of the non-settling defendants had been liable, while holding that the same defendant's only servant aboard the vessel was *not* liable, to be internally inconsistent. Because under the evidence the trial court as fact-finder could reasonably have reached either of two different consistent conclusions on liability, we remand for the trial court to make findings that are, in view of the law, internally consistent. Because there may yet be no recovery by the plaintiff, we do not reach any questions of indemnity, Mary Carter or otherwise.

*Facts*

On August 12, 1979, Allen Lane Wilkins was working as a member of the crew of the ARTHUR BRADY, a jack-up vessel being used to construct the platform around an oil well Christmas tree in the

Benckenstein, McNicholas, Oxford, Radford & Johnson, Mary Ellen Blade, Hubert

outer continental shelf in the Gulf of Mexico. A heavy prefabricated platform was being hoisted from the vessel to be fitted over the well. When the platform was improperly hoisted, it swung into the side of the Christmas tree, causing a perceived danger that the high-pressure well would blow out. Wilkins quickly grabbed the single tag line hanging from the platform and attempted to pull it away from the Christmas tree. In so doing, Wilkins suffered a ruptured disk, which required surgery.

The well was owned by Centex Oil, who is not a party in this case. Centex contracted with defendant P.M.B. Systems Engineering, Inc. (PMB) to provide design and project management services for a large offshore oil field operation of which the satellite well involved in this case was a small part.[1]

As to the particular operation in which Wilkins was injured, PMB arranged for defendant Aquatic Equipment and Engineering (Aquatic) to provide a labor crew along with a supervisor who would be capable of directing the crew, ordering material when needed and solving minor problems on the spot. Wilkins was employed by Aquatic as part of this crew. The Aquatic supervisor was Donny Criswell. PMB also arranged for defendant Otis Engineering to provide the jack-up vessel for the Aquatic crew to work on. PMB did not contract with either Aquatic or Otis, but merely negotiated the contracts between Centex and Aquatic and Centex and Otis.

However, PMB did contract directly with Bob Hendershot Consultants, Inc. (Hendershot) to provide inspection services and supervision of the installation work done by Aquatic. PMB prepared the design plans and specifications. Hendershot's role was to be a field representative and liaison for PMB, explaining the plans to Aquatic; monitoring the progress of the work; ensuring that the work conformed to the specifications; reporting back to PMB periodically; securing PMB approval for changes in the plans; and approving all time cards for Aquatic employees. Hendershot assigned defendant Richard L. Eustace, a Hendershot employee, to fill this role. Thus, PMB had no employees of its own on the vessel or at the construction site.

A principal issue at trial concerned the extent of control actually exercised by Eustace over the manner of performance of the work of the Aquatic employees, including Wilkins. Specifically, there was controversy over whether Eustace had ordered Wilkins to grab and pull the tag line, and whether Eustace was responsible for the assignment of only one person to hold the tag line.

Wilkins initially brought suit in federal court based on the Jones Act and general maritime law against Aquatic, his employer, and Otis, the owner of the vessel on which he worked and was injured. Later, Wilkins joined PMB as a defendant. Then Aquatic and Otis reached a settlement agreement with Wilkins and so informed the trial court. The trial court then severed the claims against PMB and any other defendants, and dismissed the suit against Aquatic and Otis.

1. The cast of characters includes:

—Wilkins
(Plaintiff): Employed by Aquatic. A member of the crew of the ARTHUR BRADY.

—Aquatic
(settling defendant): Provider of labor crew and its supervisor. Employer of Wilkins.

—Otis
(settling defendant): Owner and operator of ARTHUR BRADY, on which Wilkins was injured. Employer of Williams, crane operator on vessel.

—PMB
(non-settling defendant): Designer and project manager. Contracted out the inspection and field supervision responsibilities to Hendershot. Received field reports from Eustace.

—Hendershot
(non-settling defendant): Independent contractor hired by PMB to inspect and supervise construction. Employer of Eustace.

—Eustace
(non-settling defendant): Employee of Hendershot. Inspector and supervisor of work done by Aquatic. Reported directly to PMB.

■ The settlement contained a Mary Carter provision.[2] In exchange for $75,000, Wilkins not only released his claims against Aquatic and Otis, but assigned to them his causes of action against any other defendants. Specifically, Wilkins was to receive the first $10,000 of any recovery against the nonsettling defendants. Aquatic and Otis would get the next $75,000, and Wilkins would retain any amount recovered beyond $85,000.

In the severed action against PMB, PMB filed third-party actions against Aquatic, Otis, Hendershot, and Eustace. Wilkins also sued Hendershot and Eustace directly. Prior to trial, all defendants asserted cross actions against the others seeking contribution or indemnity if they were held liable to Wilkins.

After a trial consisting partly of live testimony and partly of admitted depositions, the District Court issued a memorandum opinion. The Court found that PMB was in overall control of the work on the ARTHUR BRADY that day; PMB had undertaken responsibility for the staffing of the personnel needed to do the work; and

PMB had negligently injured Wilkins by assigning too few personnel to the task.

■ In addition, the Court found that Aquatic was the Jones Act employer and was negligent in failing to provide Wilkins a safe place to work. Otis also was found negligent, because its crane operator failed properly to hoist the fabricated deck causing it to hit the Christmas tree. The Court apportioned negligence as follows: ·

| | |
|---|---|
| PMB | 50% |
| Aquatic | 25% |
| Otis | 25% [3] |

The total of damages found by the trial court was $258,698, Wilkins was awarded 50 percent of that amount ($129,349) from PMB. The Court enforced the release portion of the Mary Carter settlement agreement, and therefore there was no recovery against Aquatic and Otis. However, the Court awarded the full 50% of his damages to Wilkins, refusing to enforce the Mary Carter reimbursement provision of the settlement, under which Aquatic and Otis would have taken $75,000 of Wilkins' recovery and thus effectively paid nothing for their 50% of responsibility. The Court em-

**2.** This type of agreement takes its name from *Booth v. Mary Carter Paint Co.*, 202 So.2d 8 (Fla.Dist.Ct.App.1967). The term was coined in *Maule Industries, Inc. v. Rountree*, 264 So.2d 445, 446 (Fla.Dist.App.1972), *rev'd*, 284 So.2d 389 (Fla.1973); Note, *Mary Carter Agreements in Maritime Personal Injury Suits*, 22 S.Tex.L.J. 545, 545 n. 2 (1983). The essential terms of a Mary Carter agreement are a release of the plaintiff's cause of action in return for a settlement payment, along with a provision providing that the settling defendant would be reimbursed to some specified degree from any recovery the plaintiff received in a suit against another nonsettling defendant. The variety amongst different Mary Carter agreements is limited only by the creativity of defense lawyers.

Although in this opinion we do not reach the issue of the validity of the particular Mary Carter agreement here, or the District Court's modification of it, we point out that in several cases this Court has implicitly approved the use of Mary Carter agreements in certain circumstances. *Leger v. Drilling Well Control, Inc.*, 69 F.R.D. 358 (W.D.La.1976), *aff'd*, 592 F.2d 1246 (5th Cir.1979); *Reichenbach v. Smith*, 528 F.2d 1072 (5th Cir.1976). However, because of the adverse prejudicial effect to non-settling defend-

ants, the plaintiff, or both, resulting from some of the manipulations possible under the Mary Carter device, and because of the inherent power of a trial court to enforce settlement agreements reached in cases pending before it, and to determine the validity of such agreements, *e.g.*, *Mid-South Towing Co. v. Har-Win, Inc.*, 733 F.2d 386 (5th Cir.1984); *Strange v. Gulf and South American Steamship Company*, 495 F.2d 1235, 1237 (5th Cir.1974), it is important that the trial court retain a significant degree of discretion in approving and enforcing Mary Carter agreements, as well as in disclosing their terms to the jury. Where, as in this case, the settling plaintiff is a seaman, and thus a traditional ward of admiralty, that discretion of the court to scrutinize and determine the validity of Mary Carter agreements is magnified. We are careful not to imply that the court may approve the settlement and dismiss the defendants with one hand while it reforms the agreement and denies such defendants' reimbursement with the other hand.

**3.** Otis and Aquatic have not appealed the findings that they were negligent and that the claims against them had been released. They appeal only the trial court's refusal to enforce the assignment provision of the Mary Carter agreement in their favor.

phasized the harsh scrutiny exercised by courts in their discretion to protect seamen, who are wards of admiralty, e.g., *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942); *Wink v. Rowan Drilling Co.*, 611 F.2d 98 (5th Cir. 1980). Consequently, the Court concluded that the reimbursement provision was not supported by adequate consideration and would work an injustice if enforced.[4]

As to defendants Hendershot and Eustace, the Court held as follows:

> The Court further finds no liability against Hendershot or Eustace, who at the time said accidental injury occurred was a borrowed servant of PMB. A master who loaned a servant to another for a special service is not liable for the negligent act of the borrowed servant where that act resulted in injury to an employee of the one who borrowed the servant.

Earlier in his opinion, the trial court analyzed the borrowed servant status of Eustace, reasoning as follows:

> To determine whether the special or the general employer will be held liable for the negligent acts of the servant, the test is under whose control and direction was the servant at the time the negligent act occurred. Eustace was under the exclusive control of the defendant PMB. Because of the measure of control exercised over Eustace, he was the borrowed servant or employee of PMB though still the general employee of Hendershot. (Citations omitted).

### The Servant's Blame in the Master's Name Makes the Claim

The anomaly or inconsistency in the findings that PMB was negligent but Eustace was not is that the borrowed servant status of Eustace is, as the trial court pointed out, relevant only to determine who is liable for Eustace's negligence, and yet Eustace was found not to have been negligent. If Eustace was not negligent, as the trial court found, then PMB could not be liable as a result of his acts as a borrowed servant. Moreover, the finding that Eustace was not negligent seems inconsistent with the Court's somewhat equivocal finding that Eustace did in fact order Wilkins to grab the tag line without adequate assistance. In short, either Eustace was negligent, or PMB was not.

One possibility that conceivably could have harmonized these inconsistent findings would have been that PMB failed to supply an adequate number of men to the ARTHUR BRADY crew, as opposed to the assignment of men to the *particular* task of steadying by means of tag lines the fabricated platform being hoisted. However, any such finding would be clearly erroneous. The evidence, including testimony by the plaintiff himself, was uncontradicted that there were six or seven Aquatic employees that worked at the same site and that at least three persons on the crew who were working elsewhere on the vessel on other tasks not demanding immediate attention could have been called over to assist in the steadying of the fabricated platform as it was hoisted. Thus, there was no evidence that the Aquatic crew assigned to the ARTHUR BRADY was insufficient in number to perform its overall task or to safely hoist the platform if properly directed. The only possible negligent insufficiency of manning was in the use of only one of the available men on the crew (Wilkins) to steady the hoisted platform. Such an on-the-spot supervisory error could possibly be attributed to PMB only vicariously through Eustace, because PMB had no employees of its own on the job.

---

**4.** Both the Supreme Court in *Garrett* and this Court in *Wink* pointed out that the adequacy of the consideration is relevant in an admiralty court's scrutiny of a seaman's release to determine its validity. The party asserting the release has the burden—as would a guardian or trustee in a similar situation—of affirmatively showing that no advantage has been taken. 317 U.S. 247, 63 S.Ct. at 251; 611 F.2d at 100. A Mary Carter agreement is a form of release, and the reimbursement provision diminishes the total ultimate recovery of the seaman. Thus, it is subject to this type of scrutiny like all other seamen's releases.

Indeed, the Court seems to have predicated PMB's liability on the negligence of Eustace by finding that "Wilkins was under the control and supervision of Eustace who was acting in the course and scope of his employment for PMB, as a borrowed servant.... Wilkins understood Eustace to order him to grab, without assistance of other personnel, a tag line...." Because any liability of PMB would be vicarious, either Eustace should have been held negligent or PMB should have been held not negligent.

■ This Court cannot resolve the contradiction by concluding either that Eustace was negligent or that PMB was not, because questions of negligence and causation in admiralty are questions of fact. E.g., Cheek v. Williams-McWilliams Co., 697 F.2d 649 (5th Cir.1983); Marcona Corp. v. OIL SCREW SHIFTY III, 615 F.2d 206 (5th Cir.1980). There was sufficient conflict in the testimony for a reasonable fact-finder to resolve the question of Eustace's negligence either affirmatively or negatively.

■ We affirm the finding that Wilkins was under the active supervisory control of Eustace, even though on paper Eustace's role was cast only as an inspector, liaison, and explainer of specifications to Aquatic on behalf of PMB. Ample evidence showed that Eustace actually took detailed control over the operation and the Aquatic employees (including Wilkins), giving direct orders and retaining full authority.

■ The question of PMB's responsibility for the acts of Eustace as a borrowed servant (assuming without deciding that Eustace was negligent) is more difficult. Eustace was officially the employee of Hendershot, not of PMB, and Hendershot was hired by PMB as an independent contractor. The contract provided that Hendershot, as an independent contractor, would maintain complete control over its own employees (Eustace) and operations. This Court has consistently held that a principal who hires independent contractors over which he exercises no operational control has no duty to discover and remedy hazards created by its independent contractors. Wallace v. Oceaneering Int'l, 727 F.2d 427 (5th Cir.1984); Moser v. Texas Trailer Corp., 623 F.2d 1006, 1014–15 (5th Cir.1980); W. Prosser, The Law of Torts § 71 (4th ed. 1971); Restatement (Second) of Torts §§ 409, 414, comment at 388 (1965). Exception to this general rule occurs only where the principal (PMB), despite the independent contractor arrangement, actually retained some degree of control over the manner or methods by which the contractor (Eustace as Hendershot) does his work.

It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to the employer, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

Id. Although it is clear that Eustace exerted such detailed control over Wilkins' work, it is not clear how much operational control PMB employees ashore exercised over Eustace's supervision of the crew.

The trial court found that Eustace was under the exclusive control of PMB. This is clearly true in the sense that Eustace reported only to PMB and thus was not being operationally controlled by any other entity. However, it is unclear in light of our analysis of the inconsistency of the trial court's findings, whether the court found that PMB shore employees exerted actual operational control over the manner in which Eustace supervised the Aquatic crew so as to acquire a responsibility for its independent contractor's negligence that PMB would not otherwise bear. On remand, if the trial court finds that Eustace was negligent, it should also make specific findings regarding whether PMB shore personnel retained the right to supervise

Eustace's supervision of the Aquatic employees.

Should the trial court adhere to its finding that Eustace was not negligent, as explained above, there would be no recovery by Wilkins from PMB, or any other defendant. With only a possibility that any other defendants will be liable to the plaintiff after further proceedings below,[5] the indemnity and contribution issues must await the action of the District Court upon remand.

VACATED and REMANDED.

---

5. For clarity, we recap the issues to be decided on remand:
   1. Was Eustace negligent?
   2. If so, did PMB shore employees exert such operational control over Eustace's manner of directing and supervising the Aquatic employees as to retain responsibility for the negligent acts of an independent contractor.

   If the answers to both questions are "yes", judgment against PMB should be entered, but not otherwise. If the answers are "yes" to 1 and "no" to 2, then judgment should be entered only against Eustace and Hendershot.