United States Court of Appeals
Fifth Circuit

**F I L E D**

June 16, 2004

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

———————————

No. 03-30069

———————————

NOOR BEGUM KARIM, Etc.; ET AL.,

Plaintiffs,

FAZAL KARIM,

Plaintiff-Appellee,

versus

FINCH SHIPPING COMPANY LTD.; ET AL.,

Defendants,

and

THE LAW OFFICE OF PAUL C. MINICLIER,

Appellant.

———————————

In Re: In the Matter of FINCH SHIPPING COMPANY LTD.,
Owner and Operator of the M/V Loussio
for Exoneration from or Limitation of Liability

———————————

NOOR BEGUM KARIM, Etc.; ET AL.,

Claimants,

FAZAL KARIM,

Claimant-Appellee,

versus

THE LAW OFFICE OF PAUL C. MINICLIER,

Appellant.

———————————

Appeal from the United States District Court
for the Eastern District of Louisiana

———————————

Before JOLLY, JONES, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

This appeal is by Paul C. Miniclier; under a contingent fee contract, he represented Fazal Karim, a Bangladeshi national, for injuries received while a seaman. Karim was brought to New Orleans upon being injured but was deported to Bangladesh prior to the judgment in his favor being paid into the district court's registry. At issue is whether, after receiving that deposit, the district court erred by: denying a motion by Miniclier to disburse those funds; appointing counsel for Karim and otherwise investigating Miniclier's planned allocation pursuant to the contingent fee contract (Karim would receive nothing); and ordering disbursement in a fashion more favorable to Karim. **AFFIRMED**.

I.

The underlying litigation involving Karim and Finch Shipping Company is addressed in *Karim v. Finch Shipping Co., Ltd.*, 265 F.3d 258 (5th Cir. 2001). For this appeal, only some of the facts in that extensive litigation are relevant. In 1995, while a seaman aboard a vessel owned by Finch, Karim (a Bangladeshi national) was injured on the vessel while it was off the coast of Bermuda. After nine days of "excruciating pain", which presented "a window into Hell", *Karim v. Finch Shipping Co., Ltd.*, 94 F. Supp. 2d 727, 732 (E.D. La. 2000), he was debarked in New Orleans.

Karim's claims were presented by Miniclier in the limitation of liability proceeding filed by Finch in 1996. Later that year, Karim and Miniclier entered into the contingent fee contract at issue: Miniclier would receive 33-1/3 percent of the recovery if the case settled; 40 percent, "or as allowed by law", if tried.

Miniclier's percentage was to be calculated based on the *gross* recovery — that is, before expenses were deducted. Karim was to be responsible for court costs and other expenses, but Miniclier was permitted to advance them. As he would later represent to the district court, Miniclier advanced: $91,901.73 for advances and personal expenses ("advances to Mr. Karim for living expenses in the [United States, prior to his being deported in 1997] and his family in Bangladesh, travel, food, telephone, clothes, utilities, and rent in the [United States] and other expenses"); $62,209.79 for medical expenses; $104,252.94 for litigation expenses ("filing fees, depositions, photocopies, witness/expert fees, travel expenses for overseas depositions, service fees, translator fees, trial, transcript costs and other related litigation expenses"); and $34,129.01 for miscellaneous expenses ("primarily ... *interest* and other banking charges" (emphasis added)).

Applying Bangladeshi law of damages, the district court entered judgment in 2000 in favor of Karim for approximately $407,000, which included damages, prejudgment interest, and $70,000 for litigation costs, including attorney's fees. The damages were:

3

$13,081.28 for past earnings; $26,451.70 for future earnings; $63,668.16 for outstanding medical expenses; $20,000 for future medical expenses; and $160,000 for general damages. Our court affirmed in September 2001. Karim had been deported to Bangladesh in 1997, long before his judgment was affirmed.

After our mandate issued, Karim, through Miniclier, moved for leave to tax costs out of time; the district court denied the motion. In January 2002, in satisfaction of judgment, and *pursuant to the district court's instructions*, Finch deposited the judgment amount in the district court's registry, rather than pay the judgment to Karim, through his counsel (counsel's trust account).

Upon Karim, through Miniclier, moving to withdraw those funds, the district court denied the motion, citing its duty to ensure that the rights of seamen, as wards of admiralty, are protected, and ordering Miniclier "to submit an accounting ... detailing the expenses, costs, and fees, including attorneys fees, that will be charged against [Karim's] judgment, *as well as the net amount that will be conveyed to [Karim]* after all costs, expenses, and fees have been deducted". (Emphasis added.)

Miniclier filed the accounting at the end of January 2002, again moving to withdraw the funds. The accounting listed the litigation expenses advanced by Miniclier on Karim's behalf as more than $290,000 (again, including more than $60,000 in medical expenses, *more than $34,000 in interest/banking charges*, and more

4

than $90,000 in advances/personal expenses for Karim). Were this amount reimbursed to Miniclier (per the contingent fee contract), the amount remaining from the judgment would be less than the 40 percent due Miniclier based upon the gross amount, pursuant to the contingent fee contract; as a result, Miniclier would receive all the funds. In short, Karim would receive nothing.

Based on the accounting, the district court ordered a hearing on the motion to withdraw funds, stating:

> According to this accounting, after deducting attorney's fees, advances, medical expenses, litigation expenses, and miscellaneous expenses, the net recovery to Karim is zero. At first blush this result seems harsh. The medical providers, the attorneys, the banks, and others, received some form of recompense. Karim, who fractured his lumbar vertebra and hip, pelvis, leg, ankle, heel and wrist on the left side, sustained several herniated discs in his back and neck, as well as a detached retina in his right eye, who is permanently disabled from returning to maritime work, and who is likely to require future medical care, takes home nothing.

*Karim v. Finch Shipping Co.*, 195 F. Supp. 2d 809, 810 (E.D. La. 2002). The district court determined that legal and factual issues had to be resolved before the motion to withdraw could be decided.

The first issue was whether Bangladeshi or Louisiana law governed Miniclier's fees. If Bangladeshi law applied, Miniclier would be limited to the $70,000 for costs and fees included in the judgment; if Louisiana law applied, there was a further question of whether the fees were reasonable. In order to assist with the

5

resolution, the district court appointed the Tulane Law School Law Clinic to represent Karim for the district court's examination of the funds' proposed disposition.

Miniclier sought mandamus relief from this court. It was denied. *In re **Karim***, No. 02-30267 (5th Cir. 19 Mar. 2002).

After briefing, the district court determined that Louisiana law applied to the contingent fee contract. After further briefing and two hearings, including testimony by two experts, the district court ruled in November 2002 on the fee's reasonableness. ***Karim v. Finch Shipping Co.***, 233 F. Supp. 2d 807 (E.D. La. 2002). The court cited authority that seamen are wards of admiralty courts, and that those courts have the same equitable powers as those not sitting in admiralty; it further cited ample Louisiana and federal precedent that a court's equitable powers include the power to reform contingent fee agreements. The court concluded: "Clearly, under both state and federal law a court has the power as well as the responsibility, *particularly where seamen are concerned*, to examine and modify contingent fee agreements". ***Id***. at 810 (emphasis added).

The district court found: a 40 percent share of the gross recovery was "not totally out of line with community standards for this type of case"; and Miniclier's "work product was certainly more than adequate". ***Id***. at 811. But, the court concluded it was appropriate to modify the funds' distribution: Miniclier would be

6

reimbursed the litigation expenses (approximately $300,000); the remaining $112,928.51 would be divided equally between Karim and Miniclier ($56,464.25 each).

Several days later, the distribution to Miniclier (expenses-reimbursement and adjusted fee) was ordered (because of accrued interest, he received $57,386.44 for his fee). Karim's share, the amount now at issue, was to remain in the district court registry pending further order.

## II.

Miniclier presents two contentions: after Finch satisfied the judgment by paying it into the court registry, the district court was deprived of jurisdiction to do anything other than order the funds' disbursement; and the district court erred in finding the contingent fee agreement unreasonable under Louisiana law. (As discussed *infra*, the ultimate issue is whether the district court abused its discretion, as an admiralty court, in its treatment of its ward, Karim.)

We have jurisdiction under 28 U.S.C. § 1291 (appeal from final decision), because, as for the order at issue, the requisite "final decision is one that 'ends the litigation on the merits and leaves nothing more for the court to do but execute the judgment'". *Apache Bohai Corp., LDC v. Texaco China, B.V.*, 330 F.3d 307, 309 (2003) (quoting *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 86 (2000)), *cert. denied*, 124 S. Ct. 311 (2003). And, it goes

7

without saying that Miniclier has sufficient interest to vest him with standing to take this appeal. *See* **Castillo v. Cameron County, Tex.**, 238 F.3d 339, 349 (5th Cir. 2001).

A.

It also goes without saying that federal courts have jurisdiction only over "cases" and "controversies". U.S. CONST. art. III, § 2; *e.g.,* **McConnell v. FEC**, 124 S. Ct. 619, 707 (2003). In this regard, Miniclier contends: after the registry-deposit, no case or controversy remained; the district court was limited to simply disbursing the funds.

Miniclier relies heavily on **Brown v. Watkins Motor Lines, Inc.**, 596 F.2d 129 (5th Cir. 1979). **Brown** concerned a district court's decision "to adopt as the court's ward a minor represented by a duly qualified guardian, fix the compensation of the guardian's attorney, and direct his payment out of a tort judgment previously rendered by the court". *Id*. at 130. In reversing, a split-panel of our court held: "The case or controversy in the federal forum ended with payment of the judgment into the registry of the court". *Id*. at 132. This decision was based on there having been *no* request for relief by plaintiff concerning the fee amount. *Id*. at 131 & n.1. As discussed *infra*, that is not the situation here. Karim, represented by the legal clinic appointed by the district court, contested the disbursement sought by Miniclier. As stated in **Brown**: "It cannot be seriously doubted

8

that prior to distributing a judgment award a court has the power to decide a *contest* between the judgment creditor and his attorney over the appropriate amount of the attorney's fee lien on the judgment". **Id**. at 131 (emphasis added).

Moreover, Miniclier acknowledges **Brown**'s being distinguished in **Hoffert v. General Motors Corp.**, 656 F.2d 161 (5th Cir. Unit A 1981), *cert. denied sub nom.* **Cochrane & Bresnahan v. Smith**, 456 U.S. 961 (1982). **Hoffert** affirmed a district court's *sua sponte* decision to limit plaintiff's counsel's recovery because counsel had invoked the court's power by asking it to approve a settlement agreement. **Id**. at 164-65. For example, in ruling, the district court had felt it necessary to appoint a guardian *ad litem* for the minor injured party because of a possible conflict of interest with his father, the other injured party. **Id**.

The order at issue here resolved a controversy over which the district court had jurisdiction. Pursuant to the district court's instructions, Finch paid the judgment into the district court. Not all of the background details prompting that registry-deposit, instead of payment directly to Karim, through counsel, are reflected in the record. Nevertheless, this background illuminates the unusual situation resulting from, among other things, Karim's not being in the United States when judgment was satisfied. As noted, in the immediate aftermath of the first appeal, Karim sought permission from the district court to tax costs against Finch (the

9

judgment-debtor) out of time. Permission was denied in November 2001. In early January 2002, after the time for seeking Supreme Court review had run, Miniclier demanded payment of the judgment by Finch into Miniclier's trust account. Upon Finch not doing so, Karim moved to execute against Finch's surety bond. Following a status conference, Finch moved to pay the judgment into the court's registry, "pursuant to the verbal instructions given by the Court" at that conference.

Accordingly, Miniclier was required to move the court to disburse the funds, a motion that could be contested. The motion was contested, by the law clinic appointed to represent Karim. Miniclier waited until his reply brief to contend the clinic was improperly appointed under the *in forma pauperis* statute, 28 U.S.C. § 1915. He has waived the factual issue of whether the clinic represented Karim. And, in appointing the clinic, the district court relied in part on its inherent powers. Miniclier does not contend that those powers do not extend to that appointment.

The clinic represented Karim's interests and contested the proposed distribution. Its contesting that distribution is even more clearly a case or controversy (an actual dispute between adverse parties, *see* **Richardson v. Ramirez**, 418 U.S. 24, 36 (1974)), than had been created by the request in **Hoffert** for approval of a settlement agreement. The district court had jurisdiction.

10

B.

Miniclier claims the district court erred when, after having determined that Louisiana law governed the contingent fee contract, it subjected it to equitable revision. Miniclier bases error on three reasons: first, because the district court's ruling is self-contradictory; second, because Louisiana law does not permit an unambiguous contract for reasonable attorney's fees to be subject to equitable revision; and third, because an admiralty court's power to protect seamen does not include the revision of the contingent fee contract at issue.

1.

Miniclier asserts: "[T]he district court's determination that the Contract would be governed by the substantive laws of Louisiana, and that the only remaining issue was 'reasonableness,' pretermits the analysis of any other contractual issues which may have had an equity component". Basically, Miniclier contends that the district court contradicted itself by choosing Louisiana law but then applying admiralty principles.

Because Karim's claim against Finch was presented in a limitation of liability action, it is undisputed that the district court was sitting in admiralty for Karim's claim. To the degree Miniclier contends the district court ceased to do so when it received the judgment amount in its registry, the contention is

rejected because there was a continued case or controversy. *See supra.*

Actions to limit liability are classic maritime claims. Congress enacted the Limitation of Liability Act in 1851. 46 U.S.C. App. § 181 *et seq.* The Supreme Court summarized its cases construing the Act as follows:

> These decisions establish, first, that the great object of the statute was to encourage shipbuilding and to induce the investment of money in this branch of industry by limiting the venture of those who build the ships to the loss of the ship itself or her freight then pending, in cases of damage or wrong happening, without the privity, or knowledge of the shipowner, and by the fault or neglect of the master or other persons on board; that the origin of this proceeding for limitation of liability is to be found in the general maritime law differing from the English maritime law; and that such a proceeding is entirely within the constitutional grant of power to Congress to establish courts of admiralty and maritime jurisdiction....

*Hartford Accident & Indemnity Co. of Hartford v. Southern Pacific Co.*, 273 U.S. 207, 214 (1923) (citation omitted).

Because of the mobility of their subject, admiralty courts (perhaps more than others) face choice of law issues. *See Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1119-21 (5th Cir. 1995) (en banc). This is particularly true for limitation actions. Numerous cases discuss the method of choosing the applicable law in a federal court limitation action brought, as here, by a foreign owner of a foreign vessel. *See, e.g., Oceanic Steam Navigation*

12

*Company, Limited v. Mellor (The Titanic)*, 233 U.S. 718 (1914) (American limitation law limited remedy created by foreign law); *Black Diamond S.S. Corp. v. Robert Stewart & Sons*, 336 U.S. 386, 395-96 (1949) (foreign law creating *and limiting* a substantive right would be applied in American limitation action); *see also Karim*, 265 F.3d at 270 (quoting *Korea Shipping Corp. v. Tokio Marine & Fire Ins. Co.*, 919 F.2d 601 (9th Cir. 1990)). Moreover, courts applying admiralty law "may adopt state law by express or implied reference or by virtue of the interstitial nature of federal law". *Palestina v. Fernandez*, 701 F.2d 438, 439 (5th Cir. 1983) (quoting *Baggett v. Richardson*, 473 F.2d 863, 864 (5th Cir. 1973)).

The district court's ruling that "the attorney-client contract in this case is governed by the substantive law of Louisiana", 233 F. Supp. 2d at 809, did not mean that the court was not sitting in admiralty, any more than its previous choice of Bangladeshi law to measure damages meant it was not sitting in admiralty. Miniclier has not identified any reason why the court's application of Louisiana law meant it would be unable to exercise its ongoing powers as an admiralty court. As discussed in greater detail, *infra*, the responsibility admiralty courts have for seamen is an old and important one, not to be defeated by the fact that the contingent fee contract was formed in Louisiana.

13

2.

Because Miniclier claims the district court acted inconsistently, he contends that this appeal presents the following question: Under Louisiana contract law, can an unambiguous contract for reasonable attorney's fees be amended on the basis of admiralty equitable principles? Because the district court did not contradict itself, this appeal does *not* present an issue of Louisiana contract law. (For that reason, we reject Miniclier's alternative request that we certify the question to the Louisiana Supreme Court.) In that regard, this appeal does *not* present the issue of a federal court's well-recognized power, in general, to reform contingent fee contracts. Indeed, this power is reflected in the contingent fee contract's providing a fixed percentage for counsel, "or as allowed by law".

Instead, a much more narrow, fact-specific issue is at hand: the scope of the power of district courts, sitting in admiralty, to protect an absent seaman by adjusting his contingent fee contract (Miniclier's third basis for reversing on the merits). Therefore, although Miniclier maintains there is a legal question to be reviewed *de novo*, we are faced instead with whether the district court abused its discretion in its treatment of its ward. *See, e.g., **Wilkins v. P.M.B. Systems Engineering, Inc.***, 741 F.2d 795, 798 n.2 (5th Cir. 1984) ("Where ... the settling plaintiff is a seaman, and thus a traditional ward of admiralty, that discretion

14

of the court to scrutinize and determine the validity of Mary Carter agreements is magnified."); *Isbrandtsen Marine Services, Inc. v. M/V Inagua Tania*, 93 F.3d 728, 733 (11th Cir. 1996) (district court "abused its discretion by failing to aid the crew, wards of admiralty whose rights federal courts are duty-bound to jealously protect"; quotation marks omitted).

3.

In maintaining the district court exceeded the permissible scope of its concern for seamen, Miniclier relies upon *Bass v. Phoenix Seadrill/78, Ltd.*, 749 F.2d 1154 (5th Cir. 1985), where the district court voided a portion of a settlement agreement between an injured seaman and his employer (obviously, *not* his attorney, as discussed *infra*). We reversed, holding:

> Our ultimate concern in these cases is *not* whether the seaman has received what the court considers to be adequate consideration for the rights he has relinquished; rather, we inquire whether the seaman relinquished those rights with an informed understanding of his rights and a full appreciation of the consequences when he executed the release.

*Id*. at 1161 (quotation marks omitted). We reversed because the only finding supporting the district court's decision was inadequacy of consideration.

> We simply hold that adequacy of consideration is not the touchstone of a valid seaman's release; absent a finding that the settlement was not executed with a full understanding of the seaman's rights and the effect of the agreement thereon, the district court lacks

15

authority, *especially where the seaman testifies to complete satisfaction*, to void the agreement because the court thinks the seaman could have negotiated a better deal.

*Id*. at 1162 (emphasis added).  Accordingly, at issue is the district court's permissible scope in acting on behalf of an absent seaman with respect to his contingent fee contract.

As stated in **Bass**: "Seamen, of course, are wards of admiralty whose rights federal courts are duty-bound to jealously protect". *Id*. at 1160-61.  In fact, "[t]he protection of seamen was one of the principal reasons for the development of admiralty as a distinct branch of law".  1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW 239 (2d ed. 1994).  In accord with that goal, special legislation particular to, and particularly solicitous of, seamen has long been enacted.  *See, e.g.,* 46 U.S.C. § 10313(g) (when seamen's wages not provided within time set by statute, "the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed"); *see also* **The Osceola**, 189 U.S. 158 (1903) (surveying foreign maritime statutes on maintenance and cure); **Chandris, Inc. v. Latsis**, 515 U.S. 347, 354 (1995) ("Congress enacted the Jones Act in 1920 to remove the bar to suit for negligence articulated in **The Osceola**, thereby completing the trilogy of heightened legal protections (unavailable to other maritime workers) that seamen receive because of their exposure to the perils of the sea."; quotation marks omitted).

16

In addition to statutory protection, seamen have also long received particular care under rules created and adopted by the judiciary.  *See* ***Romero v. Int'l Terminal Operating Co.***, 358 U.S. 354, 360-61 (1959) (Article III grant of admiralty jurisdiction "empowered the federal courts ... to draw on the substantive law inherent in the admiralty and maritime jurisdiction, and to continue the development of this law within constitutional limits"; quotation marks and citation omitted).

Here, the district court was motivated by the doctrine that seamen are wards of admiralty.  *E.g.,* ***U.S. Bulk Carriers, Inc. v. Arguelles***, 400 U.S. 351, 355 (1971) ("Seamen from the start were wards of admiralty.").  In American admiralty, the doctrine is at least as old as 1823; that year, Justice Story wrote, as circuit justice, oft-cited language in support of this doctrine.

> Every court should watch with jealousy an encroachment upon the rights of seamen, because they are unprotected and need counsel; because they are thoughtless and require indulgence; because they are credulous and complying; and are easily overreached. But courts of maritime law have been in the constant habit of extending towards them a peculiar, protecting favor and guardianship. They are emphatically the wards of the admiralty; *and though not technically incapable of entering into a valid contract*, they are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees.

17

*Harden v. Gordon*, 11 F. Cas. 480, 485 (D. Me. 1823) (No. 6,047) (emphasis added). *See also Richards v. Relentless, Inc.*, 341 F.3d 35, 41 (1st Cir. 2003) ("Seamen are wards of admiralty, and their relationship with their employers is similar to the relationship between a beneficiary and fiduciary."; quotation marks omitted).

As reflected in *Bass*, 749 F.2d at 1161, this solicitude for seamen's well-being is often associated with the burdens placed on an employer to prove the validity of a seaman's release or a settlement agreement. *See also Garrett v. Moore-McCormack Co., Inc.*, 317 U.S. 239, 248 (1942) ("We hold, therefore, that the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights."); *Noble Drilling, Inc. v. Davis*, 64 F.3d 191, 195 (5th Cir. 1995) (vacating district court's enforcement of settlement agreement and remanding for a hearing); *Orsini v. O/S SEABROOKE O.N.*, 247 F.3d 953 (9th Cir. 2001) (fact issues of enforceability of release required reversing grant of summary judgment on seaman's claim).

The principle is also applied in other areas. For example, it is applied in statutory construction, by which statutes are construed in favor of seamen. *See Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 782-83, 787 (1952) (construing statute to bar employer from setting-off against seaman's wages any costs except those explicitly in statute); *see also Governor and Company of the Bank*

*of Scotland v. Sabay*, 211 F.3d 261, 265-70 (5th Cir.), *cert. denied*, 531 U.S. 959 (2000) (acknowledging the principle while concluding that, under statute, penalty wage lien did not have same priority as lien for earned wages). As another example, it is also a principle used in evaluating whether a district court has abused its discretion in procedural rulings. *See* **Isbrandtsen Marine Services, Inc.**, 93 F.3d at 733-34 (district court abused its discretion by not permitting crew's untimely intervention to enforce wages lien).

Karim cites one case in which the ward of admiralty doctrine was used to alter an attorney's contingent fee. In **Schlesinger v. Teitelbaum**, 475 F.2d 137 (3d Cir.), *cert. denied*, 414 U.S. 1111 (1973), a seaman and his attorney had entered into a contingent fee agreement; instead, the district court ordered the fee to be in accord with a schedule set by local rules. In denying mandamus relief sought by the seaman and his attorney, the Third Circuit noted that the attorney had not presented evidence, either in district court or with his mandamus request, that the contractual fee was fair. *Id*. at 142. "On the facts presented by this record, we hold that petitioners cannot rely simply on an allegation of the existence of a contingent fee agreement, which may have been dated after the establishment of the [district court's fee schedule], to nullify such guidelines as 'discriminatory, ultra vires and violative of due process' as a denial of petitioners' contract

19

rights." *Id*. Although the situation in *Schlesinger* is readily distinguishable from that at hand, it is yet another example of courts' flexible application of the ward of admiralty doctrine.

A seaman's entering into a contingent fee contract for legal services to recover for personal injury *may* have the characteristics that have historically prompted the solicitude of admiralty courts. First, one of the justifications of the doctrine was judicial recognition of the hard lot of seamen. "The paternal regard of the Courts and Congress for seamen has, for the most part, grown out of the peculiar conditions of their employment. These conditions, by their very nature rigorous and subjecting the seaman to unusually severe discipline for extended periods of time, are quite unlike the conditions which attend land labor, and have resulted in extraordinary remedies being made available to those who accept this calling." *Perkins v. American Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 597-98 (6th Cir.) (quoting *Paul v. United States*, 205 F.2d 38, 42 (3d Cir. 1953)), *cert. denied*, 534 U.S. 994 (2001). The risks associated with going to sea contribute to the likelihood that a seaman will need legal counsel. For that reason, it is appropriate for courts to concern themselves with the risks seamen face in obtaining such counsel.

Second, perhaps more importantly, it will doubtless usually be the case (and is the case here) that seamen are uncounseled in their pursuit of legal counsel. This factual scenario indicates

two things:  it is appropriate for courts to concern themselves with the contract for legal services; and, in that regard, the strictures placed on district courts by our decision in **Bass** are inapplicable.  As noted, **Bass** concerned a release between a *counseled* seaman and his employer.  As quoted earlier, our court stated: "[A]bsent a finding that the settlement was not executed with a full understanding of the seaman's rights and the effect of the agreement thereon, the district court lacks authority, *especially where the seaman testifies to complete satisfaction*, to void the agreement because the court thinks the seaman could have negotiated a better deal".  749 F.2d at 1162 (emphasis added).

Such a standard is appropriate for a *counseled* seaman.  But when he is *uncounseled* and in pursuit of legal counsel, they do not serve the same purpose.  Rather, in the words of Justice Story, courts are solicitous of seamen because "they are unprotected and need counsel".  **Harden**, 11 F. Cas. at 485.  This is especially true in this instance; Karim was deported to Bangladesh in 1997, long before the attempted allocation of *his* judgment by his attorney, pursuant to which Karim would have received nothing.

We hold:  it may be proper for a district court, sitting in admiralty, to use its admiralty powers to alter a contingent fee contract for legal services entered into by an uncounseled seaman when he is absent at the time of the attempted disbursement of his

judgment, as in this instance. Moreover, on these facts, the district court did not abuse its discretion in doing so.

In the light of Miniclier's attempt to have the judgment disbursed, the district court required Miniclier to provide an accounting. It therefore became aware that Miniclier did not intend to disburse any of the funds to Karim. In response, the court determined that further investigation was required.

The court appointed counsel for Karim and held two hearings, including hearing testimony by two experts. As stated in its order, even Miniclier's expert testified that he would have altered the fee arrangement to ensure Karim had some recovery from the judgment.

In response, the district court ordered a distribution that reimbursed Miniclier for all of his expenses, including the interest accrued on loans used to finance the litigation, and gave him half of the remainder. Miniclier places great weight on Karim's receiving advances from Miniclier, including for living and medical expenses; he urges that was recovery by Karim. Those amounts have been reimbursed to Miniclier. On this record, the district court viewed those advances as a form of economic risk-sharing for the litigation. It did not view them as a recovery from the judgment.

Miniclier contends that the district court could not alter the contingent fee contract. He does not, however, offer any basis for holding that, if the district court could alter the contract, its

22

alteration was an abuse of discretion. Having concluded that the district court could alter the contract, we have not discerned any abuse of discretion — far from it.

Along this line, Miniclier has contended repeatedly that the 40 percent fee against the gross recovery (as opposed to being against the net recovery remaining after expenses are deducted from the gross amount) is reasonable because it is common. If so, this is further evidence why seamen may need protection from such a practice. If an attorney applies his fee percentage against the net recovery (*after* expenses deducted), then the plaintiff will at least receive something (providing the judgment exceeds expenses). When the contract is as this one was (percentage taken against gross amount of judgment), it may produce the results seen here. The use of such contingent fee contracts is one reason why admiralty courts may be required to intervene to protect a seaman's recovery from a judgment in his favor when his attorney does not do so.

### III.

For the foregoing reasons, the judgment is

*AFFIRMED.*